**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| JOE ANDREW SALAZAR, | |
| Plaintiff, | |
| v. | Civil Action No. 2:20-cv-00004-JRG |
| AT&T MOBILITY LLC, SPRINT/UNITED MANAGEMENT COMPANY, T-MOBILE USA, INC., AND CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS, | JURY TRIAL DEMANDED |
| Defendants | |
| and | |
| HTC CORP., and HTC AMERICA, INC., | |
| Intervenors. | |

**DEFENDANTS' AND INTERVENORS' RESPONSIVE**
**CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.   Introduction ................................................................................................................. 1

II.  U.S. Patent No. 5,802,467 ............................................................................................. 2

III. Claim Construction Argument ....................................................................................... 3

A.   Term No. 1:  "a microprocessor for generating a plurality of control signals used to operate said system…" ............................................................................................. 3

B.   Term Nos. 2 and 13:  "a selector controlled by said microprocessor . . ."; "selector" ..... 4

C.   Term No. 3:  "a communication protocol" ....................................................................... 6

D.   Term No. 4:  "a plurality of control signals" ................................................................... 8

E.   Term No. 5:  "a plurality of reprogrammable communication protocols" ...................... 9

F.   Term No. 6:  "parameter sets" ....................................................................................... 11

G.   Term No. 7:  "such that the memory space required to store said parameters is smaller than the memory space required to store said command code sets" ........................................ 11

H.   Term No. 8:  "create;" "generate" ................................................................................ 12

I.   Term No. 9:  "generating; generated; generate" ............................................................ 13

J.   Term No. 10:  "recreate" ................................................................................................ 14

K.   Term No. 11:  "a desired command code set" ................................................................ 14

L.   Term No. 12:  "a microprocessor for generating . . ., said microprocessor creating . . ., a plurality of parameter sets retrieved by said microprocessor . . ., said microprocessor generating . . ."   16

M.      Term No. 14:  "said microprocessor generating a communication protocol in response to said user selection" ................................................................................................. 18

N.      Term No. 15:  "an infra-red frequency transceiver…" ................................................... 20

O.      Term No. 16:  "a radio frequency transceiver…" ......................................................... 21

P.      Term No. 17:  "a sound and data coupling device adapted to receive sound as data signals" 22

Q.      Term No. 18:  "configured to" ...................................................................................... 23

R.      Term No. 19:  "said communications protocols" ......................................................... 24

IV.     Conclusion ..................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

Cases

*AK Steel Corp. v. Sollac & Ugine*,

    344 F.3d 1234, 1242 (Fed. Cir. 2003) ........................................................................... 22

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*,

    224 F.3d 1308, 1317 (Fed. Cir. 2000) .................................................................... 15, 19

*Dayco Prods., Inc. v. Total Containment, Inc.*,

    258 F.3d 1317, 1327-28 (Fed. Cir. 2001) ................................................................. 4, 8

*Fin Control Sys. Pty v. Oam*,

    265 F.3d (Fed. Cir. 2001) ........................................................................................... 21

*HTC Corp., et al. v. Joe Andrew Salazar*,

    No. IPR2018-00273, Paper No. 10 at 3 (P.T.A.B. Apr. 11, 2018) ....................... 9, 14

*IAP Intermodal, LLC v. Nw. Airlines Corp.*,

    No. 2:04-CV-65, 2005 WL 6217423 (E.D. Tex. Sept. 7, 2005) ................................. 13

*In re Varma*,

    816 F.3d 1352, 1363 (Fed. Cir. 2016) ................................................................. 16, 18

*KCJ Corp. v. Kinetic Concepts, Inc.*,

    223 F.3d (Fed. Cir. 2000) ........................................................................................... 16

*Nautilus Inc. v. Biosig Instruments, Inc.*,

    572 U.S. (2014) ..................................................................................................... 10, 25

*O2 Micro Int'l Ltd. v. Samsung Elecs. Co.*,

    No. 2:04-CV-323, 2006 WL 1804616 (E.D. Tex. Jun. 28, 2006) ............................. 13

*Reese v. Samsung Telecomm'ns Am., L.P.*,

    No. 2:05-CV-415-DF, 2006 WL 6112195 (E.D. Tex. Dec. 5, 2006) ....................... 13

*Salazar v. HTC Corp.*, No. 2:16-cv-01096-JRG-RSP (E.D. Tex.) ............................................ 1, 7

*Tuna Processors, Inc. v. Haw. Int'l Seafood, Inc.*,

   327 F. App'x 204, 210 (Fed. Cir. 2009) .................................................................................. 19

*Wi-LAN, Inc. v. Apple Inc.*,

   811 F.3d 455, 462 (Fed. Cir. 2016)......................................................................................... 19

Pursuant to P.R. 4-5(b) and the Court's First Amended Docket Control Order (Dkt. #83) AT&T Mobility LLC, Sprint/United Management Company, T-Mobile USA, Inc., and Cellco Partnership d/b/a Verizon Wireless ("Defendants") and HTC Corporation and HTC America, Inc. ("Intervenors"), submit their responsive claim construction brief.

## I.   INTRODUCTION

Plaintiff's opening claim construction brief is long on legal conclusions but short on analysis or facts to support its proposed constructions.  At best, Plaintiff's brief contains string citations without any corresponding analysis to support its proposed constructions.  Likewise, the opening brief fails to identify deficiencies in Defendants and Intervenors' proposed constructions with any level of specificity.  By contrast, Defendants and Intervenors provide below thorough analysis and supporting evidence demonstrating that their proposed constructions accurately reflect how a skilled artisan would understand the disputed claim terms.  This is why Defendants and Intervenors respectfully request that the Court adopt their proposed constructions.

Rather than provide any material claim-construction analysis, Plaintiff opposes Defendants' and Intervenors' proposed constructions on two grounds.

First, Plaintiff argues that the Court should adopt the same constructions from the previous case, *Salazar v. HTC Corp.*, No. 2:16-cv-01096-JRG-RSP (E.D. Tex.) ("*Salazar 1*").  *See* Opening Br. at 8-9.  Defendants and Intervenors do not dispute that the Court could adopt constructions from the earlier case.  But, in some instances, Defendants and Intervenors respectfully disagree with the Court's constructions in *Salazar 1*, which is why they seek different constructions here. In addition, with the hindsight of the record of *Salazar 1*, Defendants and Intervenors also seek to address potential disputes regarding the scope of certain claim terms that were not construed in *Salazar 1* now in claim construction, rather than let them lie to reemerge later in the case.

Second, Plaintiff seeks to exclude Defendants and Intervenors from arguing that certain claim terms are indefinite for alleged failure to disclose those terms in their P.R. 3-3 disclosures. *See id.* at 20-21.   Plaintiff's objection should be barred as untimely because Defendants and Intervenors identified each of their indefiniteness terms in their P.R. 4-1 disclosures on March 18, 2020.  Since then, the parties exchanged proposed constructions, conducted a meet and confer on claim construction, and filed the Joint Claim Construction and Prehearing Statement.  But at no point did Plaintiff raise its objection before its opening claim construction brief.  Therefore, it is untimely.  Moreover, Plaintiff was not materially prejudiced by the alleged late disclosure because Defendants and Intervenors served their P.R. 4-1 disclosures less than six weeks after they served their P.R. 3-3 disclosures on February 6, 2020.

## II.   U.S. PATENT NO. 5,802,467

The alleged invention of the '467 Patent[1] is "a wireless and wired communications, command, control and sensing system comprising a handset and base station, for the two way communication of sound, voice, and data with any appliance and/or apparatus capable of transmitting and/or receiving compatible sound, voice and data signals."  '467 Patent at 1:8-13. The specification explains that to "have a handset that is capable of communicating with substantially all major brands of various devices," "requires a substantially large memory to store all the command code sets with various sets of signals."  *See id.* at 7:55, *et seq.*  Thus, "[h]andset 10 in accordance with the present invention employs an encoding technique to store the desired signals in a memory space in the order of 10Kbytes of data" rather than in "a memory space on the order of 135 Mbytes of data."  *Id.* at 8:10-21.  Doing so requires "a compression ratio in the order to 13000:1 and preferably 15000:1."  *See id.* at 8:13-16.

---

[1] The term "'467 Patent" refers to U.S. Patent No. 5,802,467, which was attached to Plaintiff's opening brief as Exhibit A.

The specification emphasizes the importance of software to the claimed invention. Software "within microprocessor 30 creates a generalized command and control protocol which makes it possible to interact . . . with any number of external devices . . . .  The software also provides all of the internal controls and necessary protocols for specified radio and infra-red communication links." '467 Patent at 7:14-20.  This software/hardware interaction was necessary because "[t]ypically, each manufacturer of one of these devices such as TV sets, VCR sets, CD players and Cable boxes, employs a specific communication protocol that includes a command code set for performing various functions to remotely control the device.  Each command code set comprises a set of signals, wherein each signal is utilized to perform an available function."  *Id.* at 7:40-46.

## III.     CLAIM CONSTRUCTION ARGUMENT

### A.     Term No. 1:  "a microprocessor for generating a plurality of control signals used to operate said system…"

| Defendants' and Intervenors' Construction | Salazar's Construction |
| --- | --- |
| "a microprocessor configured to bring into existence two or more control signals used to operate said system and configured to bring into existence two or more [reprogrammable] communication protocols" | "a microprocessor configured to generate a plurality of control signals used to operate said system and configured to create a plurality of [reprogrammable] communication protocols" as construed by this Court in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 15-22; Dkt. # 155). |

There are two disputes regarding construction of this term.  First, the parties dispute whether the word "generating" in this term requires bringing control signals into existence.  On that issue, Defendants and Intervenors contend that "generating" in this term means to bring into existence for the same reasons provided in section III.H below for Term No. 8 ("create;" "generate"), incorporated herein by reference.

Second, the parties dispute whether "plurality" means two or more.  The plain meaning of "plurality" is two or more.  *See Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327-28 (Fed. Cir. 2001) ("In accordance with standard dictionary definitions, we have held that 'plurality,' when used in a claim, refers to two or more items, absent some indication to the contrary.").  That is why Defendants' and Intervenors' proposed construction merely clarifies the plain and ordinary meaning of this term, without adding any limitations.

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

### B.    Term Nos. 2 and 13:  "a selector controlled by said microprocessor . . .";   "selector"

| Defendants' and Intervenors' Construction (Term No. 2) | Salazar's Construction |
|---|---|
| "a multiplexer/demultiplexer controlled by said microprocessor for enabling said radio frequency transceiver and said infra-red frequency transceiver to transmit a desired command code set generated by said microprocessor via either radio frequency signals and infra-red signals as desired, and to receive a signal from any one of said external devices via either radio frequency signals and infra-red signals" | "a selector controlled by said microprocessor for enabling said radio frequency transceiver and said infra-red frequency transceiver to transmit a desired command code set generated by said microprocessor via either radio frequency signals and infra-red signals as selected by a user, and to receive a signal from any one of said external devices via either radio frequency signals and infra-red signals" as construed by this Court in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 31-36; Dkt. # 155). |

| Defendants' and Intervenors' Construction (Term No. 13) | Salazar's Construction |
|---|---|
| "a multiplexer/demultiplexer" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 31-36; Dkt. # 155), plain and ordinary meaning. |

The dispute for these two terms is whether the claimed "selector" is "a multiplexer/demultiplexer." The '467 Patent states that "it is an object of the present invention to provide <u>full two way</u> RF and IR communication links to all types of apparatus and/or appliances for home, business, medical or industrial use." '467 Patent at 1:50-52 (emphasis added). The specification describes an "RF/IR selector" that provides this capability. *See, e.g., id.* at 20:11-17, 20:44-46, 20:60-63, 23:23-29, 23:32-38, 23:51-55, 24:25-28. Using Figure 3 as an example, RF/IR selector 52 is depicted with two-way connections (denoted by the double-headed arrows) to both radio frequency transceiver 50 and infra-red frequency transceiver 60:



*Id.* at Fig. 3 (emphasis added).

The description in the specification accords with Figure 3. When RF signals are received, "[t]he received radio frequency signals are routed by the RF/IR selector 52." *Id.* at 20:44-46. Likewise, "[t]he received infra-red frequency signals are routed by RF/IR selector 52." *Id.* at 20:49-50. Conversely, during transmission, RF/IR selector 52 "coupl[es] to the radio frequency

and/or infra-red frequency transceiver which in turn transmit[s] the appropriate signals." *Id.* at 20:62-63.

The selector described in the specification is consistent with the functionality provided by a multiplexer/demultiplexer. RF/IR selector 52 receives signals from one of two devices—either the radio frequency or the infra-red frequency transceiver (50 and 60, respectively)—and couples those signals to a common signal path. This process is depicted in Figure 3 by the lack of separate signal paths for the radio frequency and infra-red frequency transceivers. This is the same functionality as a multiplexer (which is often referred to as a data selector): namely, selecting signals from more than one input for output on a single output. Conversely, during transmission, RF/IR selector 52 receives a signal on a common signal path and routes it to either the radio frequency or the infra-red frequency transceiver, as depicted in Figure 3. This is the same functionality as a demultiplexer, namely, receiving a signal on a single input and selecting an output for the signal.

In summary, the selector is used to select between the radio frequency or infra-red frequency transceivers for both receiving and transmitting. When receiving, the selector functions as a multiplexer, and it functions as a demultiplexer during transmission. That is why Defendants and Intervenors respectfully submit that the selector is a multiplexer/demultiplexer.

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

### C. Term No. 3: "a communication protocol"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "a defined set of rules and formats that allows devices to communicate with each other" | Plain and ordinary meaning, as set out by this Court in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 42-45; Dkt. # 155). |

The only dispute here is whether the term "a communication protocol" requires construction. In *Salazar 1*, HTC Corp. proposed a similar construction that included additional limitations regarding the substance of communications between devices: "sets of rules that allow for two or more devices to communicate wirelessly with one another using a command code set to produce an action in a remotely controlled external device." *See* Dkt. 108 at 42. The Court rejected that construction, ruling *inter alia* that the defendant's proposed construction would "redefine the 'command code set' term rather than defining the 'communication protocol' term." *See id.* at 45. Taking that ruling into consideration, Defendants' and Intervenors' proposed construction in this case is tailored to the meaning of "a communication protocol" as understood by a skilled artisan.

The specification describes "[o]pen architecture software within microprocessor 30" that is used to interact with external devices. *See* '467 Patent at 7:14-19. The software also "provides all the internal controls and <u>necessary protocols</u> for specified radio an infra-red communication links." *Id.* at 7:19-21. The protocols define for the software the rules and formats used to communicate with external devices. *See id.* Indeed, the rules and formats for communication vary by device type and manufacturer as the patent concedes:

> Typically, each manufacturer of one of these devices, such as TV sets, VCR sets, CD players and Cable boxes, employs a specific communication protocol that includes a command code set for performing various functions to remotely control the device.

*See id.* at 7:40-44.

In other words, a general protocol is not sufficient to communicate with different external devices. For successful communication, the claimed "communications, command, control, and sensing system" must use the same protocol as the external device or vice versa. Defendants' and Intervenors' proposed construction is also supported by industry definitions of protocol. For example, Newton's Telecom states that

7

> Protocols define the rules by which devices talk with each other, or more formally, a protocol is a set of rules governing the format of messages that are exchanged between computers and people.

Ex. A, Newton's Telecom Dictionary 1013-1014 (30th ed. 2016) (definition of "protocol").

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

### D.      Term No. 4:  "a plurality of control signals"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "two or more control signals" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 15-22; Dkt. # 155), plain and ordinary meaning. |

Contrary to Salazar's allegation that "Defendants attempt to impermissibly read additional limitations into these well understood claim terms," the dispute here is simply whether "a plurality" means "two or more."  *See* Opening Br. at 14.  During *Salazar 1*, Salazar attempted to argue, including through his expert's opinions, that plurality could mean less than two.  It cannot. The plain meaning of "plurality" is two or more.  *See Dayco Prods., Inc.*, 258 F.3d at 1327-28 ("In accordance with standard dictionary definitions, we have held that 'plurality,' when used in a claim, refers to two or more items, absent some indication to the contrary.").  That is why Defendants' and Intervenors' proposed construction merely clarifies the plain and ordinary meaning of this term, without adding any limitations.

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

### E.      Term No. 5: "a plurality of reprogrammable communication protocols"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| Indefinite. Protocols cannot be reprogrammable.<br><br>Defendants and Intervenors provide an alternative construction for this term based on what a reprogrammable communication protocol might be if such a protocol existed: "two or more communication protocols whose rules and formats can be changed through programming" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 15-22; Dkt. # 155), plain and ordinary meaning. |

The parties disagree about whether this term is indefinite and about Defendants' and Intervenors' alternative construction. As to the former, the term "a plurality of reprogrammable communication protocols" is indefinite because protocols cannot be reprogrammable.

The term "reprogrammable" generally refers to a computer program, software, or code. A computer program, software, or code is reprogrammable if it can be replaced with a different program, software, or code. Salazar conceded this point by arguing to the Patent and Trial Appeal Board that the term "reprogrammable" means "a program that can be replaced with another." *See* Ex. B, *HTC Corp., et al. v. Joe Andrew Salazar*, No. IPR2018-00273, Paper No. 10 at 3 (P.T.A.B. Apr. 11, 2018). Although the parties dispute the meaning of "a communication protocol" (Term No. 3), there can be no legitimate dispute that "a communication protocol" is not a program. Accordingly, by Salazar's own concession to the Patent and Trial Appeal Board, communication protocols cannot be reprogrammable because they are not programs.

That communication protocols are not programs is also consistent with the specification. For example, the specification describes "[o]pen architecture software within microprocessor 30 [that] creates a generalized command and control protocol. . . ." '467 Patent at 7:14-19. Notably,

it is software (*i.e.*, a program) that creates a communication protocol.  The communication protocol itself is not a program or software.

The extrinsic evidence is also in accord.  For example, Newton's Telecom dictionary defines a "protocol" as follows:

> Protocols define the rules by which devices talk with each other, or more formally, a protocol is a set of rules governing the format of messages that are exchanged between computers and people.

Ex. A, Newton's Telecom Dictionary 1013-1014 (30th ed. 2016) (definition of "protocol").  A skilled artisan would not interpret a communication protocol as a program or software that can be reprogrammed.  This term is indefinite because a skilled artisan would not understand how a communication protocol, which is not a program or software, can be reprogrammed.  As a result, the term fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *See Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

In an effort to reconcile the term with the surrounding claim language,[2] Defendants and Intervenors propose an alternate construction:  to the extent the Court does not find this term indefinite, Defendants and Respondents respectfully submit that this term should be construed to mean "two or more communication protocols whose rules and formats can be changed through programming."

---

[2] The term "reprogrammable" only appears twice in the '467 Patent.  Both instances are in the claims.

F.     Term No. 6:  "parameter sets"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| Previous position:    "a set of predefined encoded data stored in the memory device that the microprocessor retrieves and uses to recreate a command code set"<br><br>Current position:  plain and ordinary meaning | Plain and ordinary meaning, as set out by this Court in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 46-49; Dkt. # 155). |

Defendants and Intervenors agree that this term should be construed according to its plain

and ordinary meaning.

G.     Term No. 7:  "such that the memory space required to store said parameters
       is smaller than the memory space required to store said command code sets"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| Indefinite. | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 22-30; Dkt. # 155), plain and ordinary meaning. |

Defendants and Intervenors contend that this term is indefinite because "said parameters"

lack antecedent basis.  Claim 1 recites a "memory device" that is configured to store "a plurality

of parameter sets" in a specific configuration:

> a memory device coupled to said microprocessor configured to store <u>a plurality of
> parameter sets</u> retrieved by said microprocessor so as to recreate a desired
> command code set, such that the memory space required to store said parameters is
> smaller than the memory space required to store said command code sets;

But when discussing the memory space requirements of the memory device, the claim

discusses "said parameters," not the plurality of parameter sets.  This renders the claim indefinite

for two reasons:  (1) "said parameters" has no antecedent basis; and (2) even if "said parameters"

relates to the parameter sets, it is unclear if it refers to the entirety of the plurality of parameter

sets, one of the plurality, or individual parameters within the plurality.  Given this, those skilled in

the art would be unable to determine the scope of the invention because the claim fails to inform

a skilled artisan of the components that need to be prepared in terms of memory space usage.

Absent that clarity, the claim fails to inform, with reasonable certainty, those skilled in the art

about the scope of the invention.

Accordingly, Defendants and Intervenors respectfully request that the Court find this term

indefinite.

### H.    Term No. 8:  "create;"  "generate"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "[bringing / bring] into existence" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 15-22; Dkt. # 155; Dkt.# 250 at 8-9), plain and ordinary meaning. |

The parties dispute whether the terms "create" and "generate" mean bringing / bring into

existence.  Salazar asserts that the term should be construed according to its plain and ordinary

meaning, while failing to provide any guidance as to what his alleged plain and ordinary meaning

is.  In the claims, the microprocessor "create[es] a plurality of reprogrammable communication

protocols. . . ."  The specification does not define the term "create" or "creating."  But it uses the

term to describe bringing a new protocol into existence:

> Open architecture software within microprocessor 30 creates a generalized
> command and control protocol which makes it possible to interact, in a wireless
> mode, with any number of external devices that have compatible transceivers with
> wireless communications, command, control and sensing handset 10.

'467 Patent at 7:14-19.

The "generalized command and control protocol" did not exist beforehand, so

microprocessor 30 brings it into existence.  This construction is consistent with the common

definition of "create," which is "to cause to come into existence" or "bring into being."  Ex. C,

Webster's New World College Dictionary (3d ed. 1995) (definition of "create").  In addition, courts have routinely held that the plain and ordinary meaning of "creating" and "generating" requires bringing something into existence.  *See id.*; *O2 Micro Int'l Ltd. v. Samsung Elecs. Co.*, No. 2:04-CV-323, 2006 WL 1804616, at *8 (E.D. Tex. Jun. 28, 2006) (construing "generating" to mean "bringing into existence"); *IAP Intermodal, LLC v. Nw. Airlines Corp.*, No. 2:04-CV-65, 2005 WL 6217423, at *8-9 (E.D. Tex. Sept. 7, 2005) (construing "creating" to mean "forming or making" and "generating" to mean "producing"); *Reese v. Samsung Telecomm'ns Am., L.P.*, No. 2:05-CV-415-DF, 2006 WL 6112195, at *12-13 (E.D. Tex. Dec. 5, 2006) (construing "generating" to mean "creating"); *see also* Ex. C, Webster's New World College Dictionary (3d ed. 1995) (definition of "generate" ("to bring into being").

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

## I.  Term No. 9:  "generating; generated; generate"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "[bringing / brought / bring] into existence" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 15-22; Dkt. # 155; Dkt.# 250 at 8-9), plain and ordinary meaning. |

The dispute over these terms is the same as the dispute on the previous term, "create;" "generate" (Term No. 8).  Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term for the same reasons provided for Term No. 8.

### J.      Term No. 10:  "recreate"

| Defendants' and Intervenors' Construction | Salazar's Construction |
| --- | --- |
| "bring something back into existence" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 22-30; Dkt. # 155), plain and ordinary meaning. |

The dispute over this term is related to the dispute on the "create;" "generate" term (Term No. 8).  Defendants and Intervenors propose that the term "create" means "bring into existence." And the term "recreate" is generally understood to mean "to create anew."  Ex. C, Webster's New World College Dictionary (3d ed. 1995) (definition of "recreate").  Salazar conceded this point by arguing to the Patent and Trial Appeal Board that the term "recreate" means "create again."  *See* Ex. B, *HTC Corp., et al. v. Joe Andrew Salazar*, No. IPR2018-00273, Paper No. 10 at 3 (P.T.A.B. Apr. 11, 2018).  To the extent the Court agrees that the term "create" means "bring into existence," it follows that the term "recreate" means to "bring something back into existence."

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

### K.      Term No. 11:  "a desired command code set"

| Defendants' and Intervenors' Construction | Salazar's Construction |
| --- | --- |
| "a different command code set than the command code set that defines the signals that are employed to communicate with each one of said external devices" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 22-30; Dkt. # 155), plain and ordinary meaning. |
| If this term is not given this meaning, it is indefinite for lacking antecedent basis. | |

The parties dispute whether this term should be construed as being a different code set than the code set recited earlier in the claim.  Absent that construction, Defendants and Intervenors contend that this term is indefinite for lacking antecedent basis.

Claim 1 recites this term within the "memory device" limitation:

> a memory device coupled to said microprocessor configured to store a plurality of parameter sets retrieved by said microprocessor so as to recreate <u>a desired command code set</u>, such that the memory space required to store said parameters is smaller than the memory space required to store said command code sets;

The only other "command code set" term is recited in the "microprocessor" limitation:

> a microprocessor for generating a plurality of control signals used to operate said system, said microprocessor creating a plurality of reprogrammable communication protocols, for transmission to said external devices wherein each communication protocol includes <u>a command code set</u> that defines the signals that are employed to communicate with each one of said external devices;

The "desired command code set" is clearly different than the "command code set" recited in the "microprocessor" limitation for at least two reasons.  First, different claim terms are presumed to have different meanings.  *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

Second, the patentee could have drafted the claims to use the term "<u>the/said</u> command code set" if he intended the term "desired command code set" to refer to the "command code set" from the "microprocessor" limitation.  But he did not.  Given this lack of proper antecedence, the term should either be found indefinite for lack of proper antecedent basis or be treated as a newly introduced element to the claim that is different than the "command code set" element from the microprocessor limitation.

L.     **Term No. 12:  "a microprocessor for generating . . ., said microprocessor creating . . ., a plurality of parameter sets retrieved by said microprocessor . . ., said microprocessor generating . . ."**

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "one or more microprocessors, each of which must perform the generating, creating, retrieving, and generating functions" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 15-30; Dkt. # 155; Dkt. # 250 at 8-9), plain and ordinary meaning. |

Salazar's opening brief mischaracterizes the dispute between the parties.  Defendants and Intervenors do not dispute that this term relates to the capability of the "one or more microprocessors," not "activities of the user."  Dkt. No. 108 at 21.  The dispute is whether the same "one or more microprocessors" must be configured to perform the recited generating, creating, retrieving, and configuring functions.

Claims 1 and 34 recite "a microprocessor."  There is no dispute that the indefinite article "a" when coupled with the transitional phrase "comprising" generally means "one or more."  *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'").  Here, it would allow "a microprocessor" to mean "one or more microprocessors."  But the Federal Circuit has also held that this does not negate the claim language that follows "a microprocessor."  *See In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016).

*In re Varma* involved the appeal of claim construction from the Patent Trial and Appeal Board of the Patent and Trademark Office (the "Board"), in which the Board interpreted the claim phrase "a statistical analysis request corresponding to two or more selected investments."  *See id.* at 1358.  The Board had concluded that the claim would be satisfied even if two requests would be necessary to accomplish an analysis of "two or more investments."  *Id.*  The Federal Circuit

16

rejected the Board's decision because the Board had focused on the indefinite article "a" in the phrase "a statistical analysis," rather than on the claim language that follows.  *Id.* at 1362-63.  The Federal Circuit reasoned that

> the question is not whether there can be more than one request in a claim-covered system: there can.  Rather, the question is whether 'a' can serve to negate what is required by the language following 'a': a 'request' (a singular term) that 'correspond[s]' to 'two or more selected investments.'  It cannot.

*Id.*  The Federal Circuit analogized this principle as follows:  "For a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks."  *Id.* at 1363.  Thus, the Federal Circuit concluded:

> In the present case, no matter how many requests there may be, no matter the variety of the requests the system may receive, the system must be adapted to receive a request that itself corresponds to at least two investments.

*Id.*  The situation is the same here.

The relevant claim language from claim 1 (claim 34 is identical in these pertinent parts) is reproduced below, with the functions emphasized.

> 1. A communications, command, control and sensing system for communicating with a plurality of external devices comprising:
>
> <u>a microprocessor for generating</u> a plurality of control signals used to operate said system, <u>said microprocessor creating</u> a plurality of reprogrammable communication protocols . . .;
>
> a memory device coupled to said microprocessor configured to store a plurality of parameter sets <u>retrieved by said microprocessor</u> . . .;
>
> a user interface coupled to said microprocessor . . ., <u>said microprocessor generating</u> a communication protocol in response to said user selections; and
>
> an infra-red frequency transceiver. . . .

The first instance of "a microprocessor" uses the indefinite article "a," followed by three instances that use the definite article "said."  By using "said," the patentee has provided antecedent

basis for each instance of "said microprocessor."  In other words, each instance refers to the same microprocessor.

Applying *In re Varma* to this case, an accused device must include at least one microprocessor that is capable of performing each of the recited functions—namely, generating, creating, retrieving, and generating.  It is not sufficient for multiple microprocessors to each be capable of performing a single function.  Such an outcome would violate the Federal Circuit's holding in *In re Varma*.

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

**M.  Term No. 14:  "said microprocessor generating a communication protocol in response to said user selection"**

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "said microprocessor generating a communication protocol different from the reprogrammable communication protocols"<br><br>If this term is not given this meaning, it is indefinite. | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 42-46; Dkt. # 155; Dkt. # 250 at 7-8), plain and ordinary meaning. |

Defendants and Intervenors have revised their proposed construction to better reflect the meaning of this claim term.  The real dispute is whether "a communication protocol" refers to "the plurality of reprogrammable communication protocols."  It does not.  Claim 1 recites in the microprocessor limitation "said microprocessor creating <u>a plurality of reprogrammable communication protocols</u>."  *See* '467 Patent at 25:60-67 (emphasis added).  In the user interface limitation, claim 1 recites "said microprocessor generating <u>a communication protocol</u> in response to said user selection."  *See id.* at 26:7-12 (emphasis added).  The "a communication protocol" is different from "a plurality of reprogrammable communication protocols" for two reasons.  First,

the patentee chose different terminology—the inclusion and exclusion of the word "reprogrammable," respectively—in each limitation to connote different meanings.  *See CAE Screenplates, Inc.*, 224 F.3d at 1317 ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").  Second, the patentee chose to precede the "communication protocol" generated by the microprocessor "in response to said user selection" with the indefinite article 'a,' instead of the definite article, which would have indicated that it was referring back to a previous recitation of the "reprogrammable communication protocols."  *See Tuna Processors, Inc. v. Haw. Int'l Seafood, Inc.*, 327 F. App'x 204, 210 (Fed. Cir. 2009) ("Indeed, the introduction of a new element is accomplished through the use of an indefinite article, not through the use of a definite article.").  There is no use of the definite article, "the" or "said," in this limitation.  *See Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) ("Subsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim.").  As such, the "a communication protocol" is presumed to introduce a new claim element.

Because it introduces a new claim element, the communication protocol being introduced in the user interface element must be different than the plurality of reprogrammable communication protocols introduced in the microprocessor element.  Defendants' and Intervenors proposed construction reflects this difference.  Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term for the same reasons provided above for Term No. 5.

N.      Term No. 15:  "an infra-red frequency transceiver…"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "for each of the two or more external devices, the infra-red frequency transceiver must be capable of both transmitting to that device and receiving from that device, in accordance with said communications protocols" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 31-36, 42-46; Dkt. # 155; Dkt. # 250 at 6-7), plain and ordinary meaning. |

The parties dispute whether the infra-red frequency transceiver must be capable of both transmitting to each external device and receiving from each external device.  The claims require an "infra-red frequency transceiver coupled to said microprocessor for transmitting to said external devices and receiving from said external devices."  The term "said external devices" in this limitation refers back to "a plurality of external devices" recited in the preamble.  See '467 Patent at 25:57-59 (preamble of claim 1).  Because the claimed infra-red transceiver transmits to "said external devices" and receives from the same "said external devices," the claims require that the infra-red transceiver is capable of bi-directional infra-red communication with at least two external devices.  It is insufficient that a transceiver transmits to one external device and receives from a different device:  the claim language requires that the infra-red transceiver must be capable of transmitting to at least two separate external devices and receiving from the same at least two external devices.

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

### O.      Term No. 16:  "a radio frequency transceiver…"

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "the radio frequency transceiver must transmit and receive signals in accordance with the same protocols as used by the infra-red frequency transceiver of claim 1" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 31-36, 42-46; Dkt. # 155; Dkt. # 250 at 6-7), plain and ordinary meaning. |

Patentee's choice of terminology in the claims necessitates that the radio frequency transceiver must transmit and receive signals in accordance with the same protocols as used by the infra-red frequency transceiver of claim 1.  The infra-red transceiver recited in claim 1 transmits and receives signals using "said communications protocols:"

> an infra-red frequency transceiver coupled to said microprocessor for transmitting to said external devices and receiving from said external devices, infra-red frequency signals <u>in accordance with said communications protocols</u>.

Similarly, the radio frequency transceiver recited in claim 2 transmits and receives signals using the same "said communications protocols" recited in claim 1:

> a radio frequency transceiver coupled to said microprocessor for transmitting to said external devices and receiving from said devices, radio frequency signals at variable frequencies within a predetermined frequency range and <u>in accordance with said communication protocols</u>;

The term "said communication protocols" should be given the same meaning in claims 1 and 2.  *See Fin Control Sys. Pty v. Oam*, 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("[T]he same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.").  Moreover, both terms use the definite article "said" to refer back to the same "communication protocols" recited earlier in claim 1.

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

21

**P.      Term No. 17:  "a sound and data coupling device adapted to receive sound as data signals"**

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "a device adapted to receive sound as data signals, excluding voice" | No construction necessary-plain and ordinary meaning. |

Defendants' and Intervenors' proposed construction is consistent with the plain language of the claims and intrinsic record.  This term is recited in dependent claim 7, which depends from claim 6, which depends from claim 1.  Claim 6 adds "a sound activated device coupled to said microprocessor . . . used to recognize sound signals including sound commands . . . ."  Recognition of sound commands is disclosed, for example, in the "voice activated embodiment" of the specification.  *See* '467 Patent at 21:43-58.  By using the transitional phrase "including," the "sound activated device" recited in claim 6 is not limited to sounds signals that are sound commands.

The capabilities of the "sound and data coupling device" recited in claim 7 are narrower than claim 6:  "a sound and data coupling device adapted to receive sound as data signals."  While the device in claim 6 might have been capable of receiving sound as data signals in addition to "sound commands," the device in claim 7 cannot receive sound commands.  It is limited to receiving sound as data signals only.  *See AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) ("Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend.").

Defendants' and Intervenors' proposed construction excludes voice because the specification excludes data signals from voice-related embodiments.  Each of the voice-related embodiments describes voice being used to provide commands.  *See* '467 Patent at Abstract, 17:56-60 ("A sound or voice signal received by microphone 18, is detected by a voice activated

22

device 86 and processed for pattern recognition.  Recognized patterns are translated into digital

signals by the voice activated device 86 and input to a microprocessor 30 <u>as external commands</u>.")

(emphasis added), 21:43-46 ("In the voice activated embodiment, voice commands are input via

microphone 18 to voice activated device IC 86, which scans the voice signal with a pattern

recognition algorithm."), 24:37-40 ("In a voice activated embodiment, voice command are input

via microphone 105 to voice activated device IC 305, which scans the voice signal with a pattern

recognition algorithm.").  At no point does the specification describe voice as containing data.  To

the contrary, the specification identifies voice and "data signals" as being different.  *See, e.g., id.*

at 17:41-44 ("Similarly sound, including voice, and data signals are received and transmitted via

an infra-red transceiver 60 that contains detectors and light emitting devices.").

 Accordingly, Defendants and Intervenors respectfully request that the Court adopt their

proposed construction of this term.

 **Q.** **Term No. 18:  "configured to"**

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| "a particularized arrangement of the memory device for a specific purpose" | To the extent not covered by this Court's construction in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. #108 at 22-30; Dkt. # 155; Dkt. # 250 at 3-5), plain and ordinary meaning. |

 Defendants and Intervenors agree that this term should be construed consistently with the

Court's report and recommendation on summary judgment of noninfringement.  There, the Court

rejected Salazar's argument "that a mere capability of storing, or capability of being configured to

store, is sufficient," holding that the term "require[s] some particularized arrangement of the

memory device for a specific purpose."  Dkt. 250 at 5.  Defendants' and Intervenors' proposed

construction here merely replaces the word "some" with "a" to better conform to the surrounding

claim language.

Accordingly, Defendants and Intervenors respectfully request that the Court adopt their proposed construction of this term.

**R.      Term No. 19:  "said communications protocols"**

| Defendants' and Intervenors' Construction | Salazar's Construction |
|---|---|
| Indefinite. | Plain and ordinary meaning, as set out by this Court in *Salazar v. HTC Corp.*, 2:16-cv-01096-JRG (Dkt. # 108 at 42-45; Dkt. # 155; Dkt. # 250 at 7-8). |

Defendants and Intervenors contend that this term is indefinite because the claims lack clarity regarding which communications protocols are referred to in the term "said communications protocols."  The term "said communications protocols" is recited in claims 1 and 34.   Claim 1, reproduced below, recites (i) "a plurality of reprogrammable communication protocols," (ii) "each communication protocol," and (iii) "a communication protocol" generated by the microprocessor:

> 1.  A communications, command, control and sensing system for communicating with a plurality of external devices comprising:
>
> a microprocessor for generating a plurality of control signals used to operate said system, said microprocessor creating a plurality of reprogrammable communication protocols, for transmission to said external devices wherein each communication protocol includes a command code set that defines the signals that are employed to communicate with each one of said external devices;
>
> a memory device coupled to said microprocessor configured to store a plurality of parameter sets retrieved by said microprocessor so as to recreate a desired command code set, such that the memory space required to store said parameters is smaller than the memory space required to store said command code sets;
>
> a user interface coupled to said microprocessor for sending a plurality of signals corresponding to user selections to said microprocessor and displaying a plurality of menu selections available for the user's choice, said microprocessor generating a communication protocol in response to said user selections; and

> an infra-red frequency transceiver coupled to said microprocessor for transmitting to said external devices and receiving from said external devices, infra-red frequency signals in accordance with <u>said communications protocols</u>.

Claim 34 recites the same protocols.  The claim does not provide any clarity regarding which of these protocols "said communications protocols" refers.  Moreover, "said communications protocols" could potentially refer to a combination of the three protocols recited in the claims.  A term is invalid as indefinite if, when read in light of the intrinsic record, it fails to inform those skilled in the art about the scope of the invention, with reasonable certainty.  *See Nautilus, Inc.*, 572 U.S. at 901.  This term fails to inform a skilled artisan of the scope of the invention with reasonable certainty because it might refer to one or more of the three recited communication protocols.

Accordingly, Defendants and Intervenors respectfully request that the Court find this term indefinite.

## IV.     CONCLUSION

For the foregoing reasons, Defendants and Intervenors respectfully request that the Court adopt their proposed constructions.


Dated: June 24, 2020                            Respectfully submitted,

                                                By: */s/ Todd Landis*
                                                Fred I. Williams
                                                Texas State Bar No. 00794855
                                                WILLIAMS SIMONS & LANDIS PLLC
                                                327 Congress Ave., Suite 490
                                                Austin, TX 78701
                                                Tel: 512-543-1354
                                                fwilliams@wsltrial.com

                                                Todd E. Landis
                                                State Bar No. 24030226
                                                WILLIAMS SIMONS & LANDIS PLLC
                                                2633 McKinney Ave., Suite 130 #366

Dallas, TX 75204
Tel: 512-543-1357
tlandis@wsltrial.com

John Wittenzellner
Pennsylvania State Bar No. 308996
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A #453
Philadelphia, PA 19103
Tel: 512-543-1373
johnw@wsltrial.com

Harry Lee Gillam, Jr.
State Bar No. 07921800
gil@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas   75670
Tel:  903.934.8450
Fax: 903.934.9257


*Attorneys for Defendants and Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served on June 24, 2020, with a copy of the foregoing document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3).

*/s/ Todd Landis*
Todd Landis