# EXHIBIT C

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3
JOE ANDREW SALAZAR           )(     CIVIL DOCKET NO.
4                            )(     2:16-cv-196
     VS.                     )(
5                            )(     MARSHALL, TEXAS
                             )(     1:10 P.M.
6   HTC CORPORATION          )(     May 7, 2018

7
                  TRANSCRIPT OF JURY TRIAL
8                    AFTERNOON SESSION
          BEFORE THE HONORABLE RODNEY GILSTRAP,
9               UNITED STATES DISTRICT JUDGE

10
    APPEARANCES:
11

12  FOR THE PLAINTIFFS:

13  DARIUSH KEYHANI
    FRANCIS STEPHENSON
14  MEREDITH & KEYHANI, PLLC
    125 Park Avenue, 25th Floor
15  New York, New York 10017

16  ANDY TINDEL
    G. BLAKE THOMPSON
17  MT$^2$ LAW GROUP
    MANN|TINDEL|THOMPSON
18  300 West Main Street
    Henderson, TX 75652
19

20
    COURT REPORTER:          Shelly Holmes, CSR-TCRR
21                           Official Reporter
                             100 E. Houston Street
22                           Marshall, Texas  75670
                             (903) 923-7464
23

24  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
25

```
 1  FOR THE DEFENDANTS:

 2
    FRED I. WILLIAMS
 3  MARIO A. APREOTESI
    VINSON & ELKINS LLP
 4  2801 Via Fortuna, Suite 100
    Austin, TX 78746
 5

 6  TODD E. LANDIS
    ERIC J. KLEIN
 7  VINSON & ELKINS LLP
    2001 Ross Avenue, Suite 3700
 8  Dallas, TX 75201

 9
    MR. HARRY LEE "GIL" GILLAM, JR.
10  GILLAM & SMITH, LLP
    303 South Washington Avenue
11  Marshall, TX 75670

12
    PARKER HANCOCK
13  VINSON & ELKINS LLP
    1001 Fannin, Suite 2500
14  Houston, TX 77002

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

 1       (Jury out.)

 2       COURT SECURITY OFFICER:  All rise.

 3       THE COURT:  Please be seated.

 4       All right.  Counsel, is there anything we need to

 5  take up before I bring in the jury and begin with my

 6  preliminary instructions?

 7       MR. TINDEL:  Not from the Plaintiff, Your Honor.

 8       MR. GILLAM:  Nor from the Defendants, Your Honor.

 9       THE COURT:  All right.  Then if you'll bring in the

10  jury, please.

11       COURT SECURITY OFFICER:  All rise for the jury.

12       (Jury in.)

13       THE COURT:  Welcome back from lunch, ladies and

14  gentlemen.  Please be seated.

15       Ladies and gentlemen, I have some preliminary

16  instructions that I'd like to give you before we start with

17  opening statements from the lawyers and then move on to the

18  evidence.

19       You've now been sworn as the jurors in this case,

20  and as the jury, you are the sole judges of the facts.  As

21  such, you will decide and determine all of the facts in this

22  case.

23       As the Judge, I will give you instructions on the

24  law, decide questions of law that arise during the trial,

1   incorporating the little company known as Innovative --

2   Innovative Industries.  And it was identified as Innovative

3   Intelcom Industries.  Intelcom is important because that

4   means we named the company after an objective we had, was to

5   create products that had -- that performed intelligent

6   communications, that's what Intel stands for.

7   Q.  And what was the purpose of this company, Mr. Salazar?

8   A.  The purpose of the company was to find investment

9   capital.  Obviously, we need money to continue -- not only

10  to continue the preparation of patent application, but we

11  needed money to begin to do prototypes, developments.  And

12  so we formed this company as a California C corporation,

13  known as a corporation doing business in California, and

14  that's the name of the company.  And the purpose.

15          Obviously, the second -- the second and maybe more

16  important purpose to do business was to develop the --

17  the -- the -- the -- a device that reflected the

18  requirements of the patent.

19  Q.  Did you pursue products through this company,

20  manufacturing of products?

21  A.  Yes, we did.

22  Q.  Can you explain which products?

23  A.  We did.  However, we -- the -- we pursued a very

24  specific and well-known strategy in business for new

25  companies, especially where research and development is

1    required.  The first thing you do after you have enough

2    definition, what it is you wanted to do, you then begin to

3    prove that you can do it, and you do that by developing

4    prototypes.

5            They're not complete devices that reflect the

6    entire patent or description and be a part of it.  So we

7    began to develop in effect prototypes trying to prove

8    different things, different things that we needed to know.

9    And we continued that through the first four products, I

10   believe.

11   Q.  Did you have investors for this?

12   A.  Yes, we did.  Had investors.  We raised enough money to

13   do what we had to do up to that point, but not enough to

14   finish it.

15           MR. KEYHANI:  Could we pull up Exhibit 249?

16   Q.  (By Mr. Keyhani)  Mr. Salazar, do you recognize the

17   product depicted in Plaintiff's Exhibit 249?

18   A.  Yes, I do.

19   Q.  What product is this?

20   A.  This is the -- I believe this is the product we did for

21   Hughes Network Systems, that they used for their DirecTVC --

22   DirecTV operation.

23           MR. KEYHANI:  And can we go to the second page of

24   this exhibit, please?

25   Q.  (By Mr. Keyhani)  Can you tell us whether you put your

1   patent number on this product?

2   A.  Yes, it is on it.

3   Q.  Where -- where on the product is -- is this patent

4   number?

5   A.  It's on the base.

6   Q.  And can you explain to the jury and the Court how this

7   system worked?  In simple terms.

8   A.  Yeah, the system is comprised of two elements.  One is a

9   handset, and one is the base.

10          The base was needed in order to communicate to the

11  telephone system.  The handset was capable of talking to the

12  base, but in order to connect to the telephone system, we

13  needed a base to connect the wire to it.  So you can speak,

14  you could activate the phone through your handset, perform

15  all of the telephone operations that were required.  And --

16  and then from the handset, that information -- or

17  information was transmitted to the base, and the base then

18  put it on to the telephone line.

19          The base also received return information of the

20  call you had just received, and that base then transferred

21  that same call or information to your handset.  And you

22  could use that hand -- handset then to conduct your

23  communication.

24  Q.  Mr. Salazar, can you tell the jury and the Court whether

25  the handset by itself could function as a product?

A.   No, not completely because the requirement was for the

base to also communicate in infra-red -- for example, to

control an appliance -- some appliance, some entertainment

appliance, and the handset could not operate by itself

because it needed the base to do the voice communication,

and it also needed the base to charge itself with.

Q.   Can you tell us if this product -- you call it the

Hughes product?

A.   Yes.

Q.   If this product embodied your invention as you

understand it in your -- in your patent?

A.   No, it did not.

Q.   And can you tell us why?

A.   It did not incorporate all of the attributes or -- or

features required by the patent.

Q.   For example, what particular features it did not embody?

A.   It did not embody -- one of the things required in a

patent is two-way infra-red communications, sending

infra-red signals out, and we can receive infra-red

signal -- signals back.

        This product could -- could not receive infra-red

signals back.

Q.   What other features did it not incorporate that were

part of your invention as you understand?

A.   Well, it did not include the capability to create new

1   command and control codes, for example.

2   Q.  Is that what you referred to as intelligence?

3   A.  Yes.

4   Q.  Can you explain that?

5   A.  In order to -- in order to create new command and

6   control codes, you need a way to do that very smartly, kind

7   of a complex -- not a simple thing to do.  But you have to

8   find -- you have to -- need a way to create not only one but

9   maybe a number of codes because if you have a new or even an

10  old device, appliance, for example, an entertainment device,

11  there are a number of control codes that are different for

12  each possible function.  You have -- you have volume up,

13  volume down, or you have on or off or have channel up or

14  channel down, or it could have been executing a pay-per-view

15  or you could have performed a number of functions.

16          To create this new code, you had to have a way to

17  do it very, very smartly, kind of -- we describe that as an

18  intelligent way.  There's an algorithm that then -- that's

19  required for our patent.  It has to be employed or a similar

20  algorithm -- method has to be employed in order to do that

21  work.

22  Q.  Are you speaking about -- are you talking about creating

23  command codes?

24  A.  Yes.

25  Q.  Mr. Salazar, why is your patent number on this product

 1    when you said it does not embody all the features of your

 2    patent?

 3    A.  The reason we did that is because we thought that we had

 4    to -- call that ignorance if you like, basically we thought

 5    we had to -- or could -- could do it without any problem.

 6           Secondly, there was some attributes or features in

 7    this product we put together that in our mind needed

 8    protection.  Rightfully or wrongfully, that's what we

 9    thought.

10           MR. KEYHANI:  Can we take a look at Exhibit 251,

11    please -- what's been admitted as Plaintiff's Exhibit 251?

12           And if you could kindly go to the second page, Mr.

13    Mart, please.

14    Q.  (By Mr. Keyhani)  Mr. Salazar, do you recognize this

15    device?

16    A.  Yes, I do.

17    Q.  And can you explain to us what this device is?

18    A.  This is a -- it's called the 650D, Version 650, a number

19    we assigned to it.  We put this product together for several

20    different reason -- not technology, per se.  We put this

21    product together because we were looking for a way to make a

22    similar product or the final product at low cost.  So we

23    contracted a manufacturer in -- in China to put together

24    this product at the lowest cost possible.  It's effective of

25    over half lower than the other previous prototypes that we

 1    had built.

 2    Q.  And, Mr. Salazar, about what year did you manufacture

 3    this product?

 4    A.  '58, '59, I'm not sure.

 5    Q.  I think you may want to think about that, if that's

 6    correct, that date?

 7            MR. KEYHANI:  Your Honor --

 8    A.  No, the -- the first product we developed was a Hughes

 9    product that was shown earlier.  This was the second one.

10    Q.  (By Mr. Keyhani)  Okay.  This is the second version of

11    the product?

12    A.  Yes, the second version of the product.

13    Q.  Can you tell us whether this version of the product

14    embodied all the features of your invention?

15    A.  No, it did not.

16    Q.  And can you explain why?

17    A.  Again, fundamentally because the technology was not

18    there in the industry.  We needed components.  We needed a

19    lot of things in order to -- to develop the -- the vision

20    that we had, the requirement that we had for a full-blown

21    communications, command and sensing system.  And so we were

22    prototyping, basically.  This prototype was done for an

23    economic reason.  We wanted to know if we could build it at

24    a lower cost.

25    Q.  And what features of your invention, as you understand

1   it, were not incorporated into this product?

2   A.  Okay.  Particularly, it did not have the two-way

3   infra-red communications.  It could only communicate one

4   way.

5   Q.  And what else?

6   A.  Secondly, you could not -- you could not use it to

7   communicate with sensors.  You could not -- you could not

8   up -- update the command and control codes either.  So there

9   were at least three major features of the -- described in

10  the patent that we could not do.

11  Q.  What about that intelligence aspect that you described,

12  did this product have it?

13  A.  No, it did not do that either.

14  Q.  Okay.

15       MR. KEYHANI:  Can we go to the second page of this,

16  please?

17  Q.  (By Mr. Keyhani)  Did you put your patent number on this

18  product?

19  A.  Yes, I did.

20  Q.  Can you tell us whether this product handset could

21  function by itself without the space?

22  A.  Without what, sir?  Excuse me.

23  Q.  I'm sorry.  Can you tell us whether the handset of this

24  product could function separately from the base?

25  A.  No.

1    Q.  And can you explain why?

2    A.  Because, first of all, it required the base to -- for

3    charging, okay?  It also required the base for voice

4    communications and oral telephone calls.

5    Q.  Could the handset operate -- to what extent could the

6    handset by itself operate as a functional product for the

7    purposes intended -- as a cell phone at the time?

8    A.  It could -- it could not do it -- anything, basically

9    because the handset is by itself could not communicate

10   without the base to make telephone calls.

11        Secondly, it could not be recharged.

12   Q.  As with the other product that you marked your patent

13   number on it, was -- was the purpose to -- was the marking

14   on the base of this to indicate that the whole product was

15   covered by the patent or just the base?

16   A.  Unintentionally, it was intended that we would -- it

17   would mark the entire product.

18        MR. KEYHANI:  Mr. Mart, could we go to Exhibit 259,

19   please?

20   Q.  (By Mr. Keyhani)  This has also been admitted into

21   evidence as Plaintiff's Exhibit 259.  Mr. Salazar, can you

22   tell us whether you recognize this product?

23   A.  Yes, I do.

24   Q.  What is this product?

25   A.  This is the product we designated as My1Remote.  This

1    product -- the difference between this and prior products

2    was that this product operated in a 2.4 gigahertz area.

3    It's an improvement for a number of reasons, but basically,

4    that's why we ended up proofing with this product.

5    Q.  And did this product embody all the features of your

6    invention?

7    A.  No, it did not.

8    Q.  And -- and what particular features, for example, it did

9    not embody?

10   A.  First of all, it did not embody transceiver or two-way

11   infra-red communications.

12   Q.  What else?

13   A.  It did not embody the ability to create new remote

14   control codes from a -- from a parameter set.

15   Q.  Is that what you referred to as -- as intelligence form

16   of --

17   A.  Yes, yes.

18   Q.  What about sensing?

19   A.  It could not -- it could not operate in a sensing mode

20   either.

21   Q.  And now, we've shown you three products.  Can you tell

22   us why none of the products that you manufactured at this

23   time through I3, your company, could actually practice

24   the -- the -- all the features of your invention?

25   A.  First of all, and most importantly, was that the

1    technology in the industry was not there.  For example, to

2    implement the entire patent would have required something

3    equivalent to or like Android, the operating system, which

4    are -- are the -- HTC uses.  It's a very critical element in

5    order to do a complete -- develop a complete communications,

6    command, control and sensing system.

7              So that was one attribute, but the technology

8    wasn't there.  Even memory -- there was not enough -- or

9    not -- memory chips or integrated circuits, it did not have

10   the capacity to perform the entire functionality as required

11   and defined by our patent.

12   Q.  So if you weren't designing products at the time that

13   embodied all the features of your patent, what was the

14   purpose of these products?  What was the purpose of -- of

15   developing these products?

16   A.  Basically, it was to prove that we were on the right

17   track, that we could do things, and we were trying to do it

18   incrementally, and eventually get to a stage where the

19   technology caught up with us, or we had enough money --

20   investor's money to go after it all by ourselves.

21   Q.  As to the other products, to what extent the handset of

22   this particular product by itself could function for its

23   intended purpose?

24   A.  Pretty -- pretty much by itself -- by itself to operate

25   entertainment appliances.  It could do that through

1  infra-red control.  But it could not perform the telephone

2  function because it needed the base.

3  Q.  What else -- what else did it need the base for?

4  A.  Well, not only to connect with the telephone line and

5  perform the telephone operation, but also to charge the

6  handset.  This handset was discharged.  You need -- the only

7  way to recharge it was to put it on the -- put it on the

8  base.  Or if you were a very clever guy, you could go --

9  Jerry-rig a little way to do it which can be done.  I heard

10  people were doing that.  But consumers would not want to do

11  that.

12        MR. KEYHANI:  Mr. Mart, could we go to the second

13  page of this exhibit, please?

14  Q.  (By Mr. Keyhani)  Was this product marked with the

15  patent number?

16  A.  Yes, the base was.  I just showed you that.

17  Q.  Okay.  And also --

18        MR. KEYHANI:  Could you go back to the first page?

19  Q.  (By Mr. Keyhani)  And was the base of this product also

20  marked, the patent number?

21  A.  Yes.  The base was marked, yes.

22  Q.  And why didn't you mark the handset of this product,

23  also?

24  A.  In my mind at the time, the base and the handset within

25  its own nature and use, the way it was intended to use, was

1   a system that had to -- that were put together by design to

2   work together by design.  That's how we described, in

3   effect, kind of a simple system.  And so we thought and felt

4   that all we needed to do was -- was mark the base.

5   Q.  And as you said that this product and the two other

6   products, can you tell us whether they -- any of them, just

7   in summary, practiced all the features of your invention?

8   A.  No, they did not.

9   Q.  What did I3 do during the period in which it was in

10  business, besides the creation of the products?  Was that

11  the main purpose?

12  A.  Well, that was the main purpose.  Obviously originally,

13  the first two or three years were to sell issues -- stock,

14  which we did to raise money.

15  Q.  Did you have shareholders?

16  A.  Shareholders.  Yeah, we had shareholders.

17  Q.  Were you a shareholder yourself?

18  A.  Yes, I was.

19  Q.  Did you invest your own money?

20  A.  Yes, I did.

21  Q.  Significant amount of money?

22  A.  It was to me in those days.

23  Q.  How many years of your life did you put in into -- and

24  time into your patent and into developing these prototypes?

25  A.  It's basically from 1993 through 2006.

```
 1  products, whatever it was back at that time, in trying to
 2  compete out there with everyone else, that was not
 3  successful during that time period of around six years; is
 4  that correct?
 5  A.  It's correct, it was not successful, yes, sir.
 6  Q.  One of the products that I3 sold during that time was
 7  the Phone 2000?
 8  A.  Yes, very early, yes.
 9  Q.  Other products included the Hughes Remote Phone that you
10  sold from 1999 to 2001?
11  A.  That's correct.
12  Q.  Another one was the 650D My Remote -- My1Remote that you
13  sold in 2001?
14  A.  That's correct.
15  Q.  And the other one was the My1Remote 2003 to 2005?
16  A.  That's correct.
17  Q.  Now, you told this jury earlier that those phones did
18  not embody or did not practice the '467 patent, is that what
19  you're contending today, is those products do not -- or did
20  not practice the '467 patent?
21  A.  I'm -- I'm contending they did not embody the complete
22  description of the patent.  However, it did -- it did embody
23  some features of it, yes.
24  Q.  Well, what you told the world back in 2000 -- or I'm
25  sorry, 1999 through 2005 was that those products were
```

 1  Exhibit 94.0013, please?

 2  Q.  (By Mr. Gillam)  Mr. Salazar, I wanted to --

 3  A.  Yes.

 4  Q.  -- direct your attention to the bottom of this page.

 5  A.  Yes.

 6  Q.  This is your signature to the question that we just

 7  talked about.  You see that, sir?

 8  A.  Yes, sir.

 9  Q.  And you say it says:  Pursuant to 28 U.S.C. 1746, I

10  declare under penalty of perjury under the laws of the

11  United States of America that the following -- I'm sorry,

12  that the foregoing is true and correct and that this

13  declaration was executed on September 1st, 2017?

14  A.  Yes, sir.

15  Q.  You see that?

16  A.  Yes, sir.

17  Q.  It means the answer that you gave us about the products

18  that were covered by the patent that we've just gone over

19  with -- all those that were marked that you said was signed

20  off on less than a year ago?

21  A.  Yes, I understand that.

22  Q.  And this is your signature, isn't it, sir?

23  A.  Yes, it is.

24  Q.  And so today, what you're telling the jury is what

25  the -- the patent didn't really cover those products,

1    correct?

2    A.  What I'm saying is that the products did not represent

3    the patent in its entirety.

4    Q.  But what you told us on September 1st, 2017, was that

5    the products were covered by patent, correct?

6    A.  Yes, sir.

7              MR. GILLAM:  Your Honor, could we approach?

8              THE COURT:  Approach the bench.

9              (Bench conference.)

10             MR. GILLAM:  Your Honor, I also want to ask him

11   about -- this is their first amended -- I'm sorry, their

12   second amended complaint that they filed in this case,

13   specifically a portion of it that says after the '467 patent

14   issued in 1998, beginning in 1999, Salazar manufactured and

15   sold products that embody the invention disclosed and

16   claimed in the '467 patent, and then talks about the

17   marking.

18             So this is just further evidence that they, in

19   fact, have taken the position until today, that the '467

20   patent embodies --

21             MR. KEYHANI:  Your Honor, that's -- that's not

22   correct.

23             THE COURT:  Why is it not correct, Mr. Keyhani?

24             MR. KEYHANI:  Because for the first time,

25   Defendants pose an affirmative defense in March of marking

1   A.   That's correct, yes, sir.

2   Q.   And did you -- did you mark these products to mislead

3   the public, Mr. Salazar?

4   A.   Of course not, no, sir.

5   Q.   And the answer to your interrogatory, if we pull it up,

6   it says the products were marked.  Did you -- did you

7   understand that -- that that interrogatory meant that you

8   have to embody every feature of your patent to be marked?

9   A.   No, I did not.

10   Q.   So is it -- is it -- is it your testimony here today,

11   Mr. Salazar, that your marking of the products and your

12   response to interrogatory is -- if it's an error, it's

13   because of an innocent error; is that correct?

14   A.   That's correct, yes, sir.

15   Q.   And you were not trying to mislead the public or the

16   jury today with respect to this testimony, were you, Mr.

17   Salazar?

18   A.   No, sir, not at all.

19   Q.   Do you have any legal background that -- that would

20   allow you to know what the specific rules are with respect

21   to marking of products and whether if it's a feature of your

22   product -- of your patent or all the features, whether you

23   should mark it?

24   A.   No, I do not.

25   Q.   Mr. Salazar, HTC Corporation's counsel here was asking

1                              CERTIFICATION

2

3                  I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes of

5    the proceedings in the above-entitled matter to the best of

6    my ability.

7

     /s/ Shelly Holmes
8    SHELLY HOLMES, CSR, TCRR                    May 7, 2018
     Official Court Reporter
9    State of Texas No.:  7804
     Expiration Date  12/31/18
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25