1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
2                             MARSHALL DIVISION

3   JOE ANDREW SALAZAR,              (   CAUSE NO. 2:20-CV-004-JRG
              Plaintiff,             )
4                                    (
    vs.                              )
5                                    (
    AT&TMOBILITY, LLC., et al.       )
6             Defendants.            (
                                     )
7   and                              (
                                     )
8   HTC CORP., and HTC AMERICA,      (   MARSHALL, TX
    INC.,                            )   MAY 11, 2021
9             Intervenors.           (   10:00 a.m.
    _____

10

11

12

13  _____

14                       PRETRIAL CONFERENCE

15          BEFORE THE HONORABLE RODNEY GILSTRAP
                  UNITED STATES DISTRICT JUDGE
16  _____

17

18

19

20

21

22                  SHAWN McROBERTS, RMR, CRR
23                1100 COMMERCE ST., RM. 1504
                     DALLAS, TEXAS  75242
24                      (214) 753-2349
                 shawn_mcroberts@txnd.uscourts.gov
25

1
2

<u>A P P E A R A N C E S</u>

3    FOR THE PLAINTIFF:  KEYHANI, LLC
                         1050 30TH STREET, NW
4                        WASHINGTON, DC  20007
                         (202) 903-0326
5                        BY:  MR. DARIUSH KEYHANI

6                        PATTON TIDWELL & CULBERTSON, LLP
                         2800 TEXAS BOULEVARD
7                        TEXARKANA, TX  75503
                         (903) 792-7080
8                        BY:  MR. GEOFFREY CULBERTSON

9    FOR THE DEFENDANTS: WILLIAMS SIMONS & LANDIS, PLLC
                         327 CONGRESS AVE., SUITE 490
10                       AUSTIN, TEXAS  78701
                         (512) 543-1354
11                       BY:  MR. FRED WILLIAMS
                              MR. TODD LANDISMICHAE
12                            MS. JOHN WITTENZELLNER

13                       GILLAM & SMITH, LLP
                         303 SOUTH WASHINGTON AVENUE
14                       MARSHALL, TX  75670
                         (903) 934-8450
15                       BY:  MR. HARRY GILLAM
16
17
18
19
20
21
22
23
24
25

1          THE COURT:  Be seated, please.

2      All right.  This is the time set for pretrial matters

3  before the Court in the case of Joe Andrew Salazar versus AT&T

4  Mobility, LLC, et al.  This is Civil Case No. 2:20-CV-004.

5      Let me ask for announcements on the record at this time.

6  What says the Plaintiff.

7          MR. CULBERTSON:  Your Honor, Geoff Culbertson and

8  Darius Keyhani and Frances Stephenson.  Plaintiff is ready.

9          THE COURT:  All right.  Thank you, Mr. Culbertson.

10      What says the Defendants?

11          MR. GILLAM:  Good morning, Your Honor.  Gil Gillam

12  along with Fred Williams, Todd Landis, John Wittenzellner,

13  Adam Livingston for the Defendants and Intervenor, Your Honor.

14  We are ready to proceed.

15      And Your Honor, I know that the Court wants only three at

16  the counsel table.  I'm not having a speaking role this

17  morning.  If you want me to move back here, I will; or if I'm

18  allowed to stay here, I'll do so.

19          THE COURT:  Four is all right for pretrial,

20  Mr. Gillam.

21          MR. GILLAM:  Thank you.

22          THE COURT:  All right.  Thank you for that

23  announcement.

24      Let me cover some housekeeping matters with the counsel

25  before we get into the disputed substantive motions, motions

1    in limine, and disputed exhibits.

2         As you are aware or should be aware, this case is set for

3    jury selection to take place on Thursday, June the 3rd, with

4    the trial itself to begin on the following Monday the 7th.  At

5    this point it's my intention to select the jury and give my

6    preliminary instructions, and then have counsel present their

7    opening statements on Thursday, excuse the jury, and bring

8    them back on Monday the 7th and begin with Plaintiff's first

9    witness in Plaintiff's case in chief.  Now, that's subject to

10   change, but that's my thinking at this point.  So don't come

11   prepared on the 3rd simply to impanel the jury and go home.

12   We may have to do opening statements after the Court gives its

13   preliminary instructions to the jury.

14        I'm going to afford each side 30 minutes per side to

15   examine the venire panel.  And as is the Court's traditional

16   practice, I'll afford each side the option to use up to three

17   minutes of their initial -- up to -- their initial three

18   minutes of time to give the jury a very high-level,

19   non-argumentative, thumbnail sketch of the issues in the case

20   simply to provide a bare amount of context.  I'll remind both

21   sides that that three-minute introduction is not to be

22   argumentative, and if I deem it to be argumentative, I will

23   call you down in front of the panel and cut you off, and I

24   don't think you want me to do that.  So make sure if you

25   provide that bare-bones context in the first three minutes of

1      your examination time with the panel that you keep it

2      high-level and non-argumentative.

3           We're going to seat eight jurors in this case and each

4      side will be afforded four peremptory challenges.

5           I'm going to provide each side with 11 and a half hours

6      to put on their evidence and testimony in the case.  That does

7      not include jury selection, that does not include opening

8      statements, and that does not include closing arguments.  I'm

9      going to afford each side 30 minutes per side for opening

10     statements, and I'm going to afford each side 40 minutes per

11     side for closing arguments.

12          With regard to closing arguments, the Court's practice

13     and its rule is that Plaintiff can divide their time between a

14     first and a second closing as long as they use at least 50

15     percent of their time in their first closing argument; so not

16     less than 20 minutes of Defendant's closing argument time in

17     the first closing.

18          The Court's going to follow it's typical procedure

19     through the trial and requiring the parties to meet and confer

20     with regard to demonstratives and any other late-breaking

21     disputes, with an email update to my law clerks not later than

22     10:00 p.m. on the night before any such demonstratives will be

23     used before the jury or in regard to the other -- any other

24     similar disputes.  And that email report at 10:00 p.m. is not

25     a point in time at which you should discontinue your meet and

1    confer efforts.  You should continue those.  And if by 7:00

2    the next morning anything is still in dispute and has not been

3    resolved, then you should deliver a three-ring binder to

4    chambers at 7:00 a.m., including printed copies of what's in

5    dispute together with a succinct narrative, hopefully not more

6    than one paragraph, setting forth each party's position as to

7    any such disputes.  And I'll review those and be available to

8    meet with you in chambers at 7:30 and provide guidance to you

9    on those disputes, which is the Court's intentional way of

10   helping you maximize and lengthen your designated but limited

11   trial time.

12        To the extent there's going to be a need to present

13   proprietary or confidential information to the jury, I'll

14   refer both sides to the Court's standing order on protecting

15   such information through process of sealing the courtroom.

16   I'll remind you that post-trial redactions are not the

17   approved method for protecting or redacting confidential

18   information from the record.

19        The Court will also follow its typical practice in

20   deferring any motions under Rule 50(a) of the Federal Rules of

21   Civil Procedure until all of the evidence has been

22   presented--that being the Plaintiff's case in chief, the

23   Defendant's case in chief, and any rebuttal case the Plaintiff

24   might put on.

25        After the close of all the evidence, then the Court will

1    hear motions that either party may care to offer under Rule

2    50(a).

3         After I have heard and ruled on any such motions, then I

4    will proceed to conduct an informal charge conference off the

5    record informally to get the parties' input by means of a

6    fulsome discussion regarding any areas of the then proposed

7    charge and verdict form where the parties are in disagreement

8    or where the Court thinks, even if the parties are in

9    agreement, that a different wording or instruction or verdict

10   question might be appropriate.

11        And then after I've had the benefit of that fulsome

12   discussion informally, I'll generate what I believe should be

13   the proper final jury instruction and verdict form.  I'll

14   provide it to counsel with an opportunity to review it, and

15   then I'll conduct a formal charge conference on the record

16   where each side can lodge such objections as they think the

17   best interest of their client requires.

18        After I've ruled on any formal objections through the

19   formal charge conversation, then I will generate eight printed

20   copies of the final jury instructions and a single copy of the

21   verdict form which I will send back to the jury when they

22   retire to deliberate.  And I will tell the jury during my

23   final instructions to them that they are going to have their

24   own printed copy of these instructions when they retire to the

25   jury room so that they'll know they don't have to sit there

1    and take copious notes while I'm giving those lengthy

2    instructions.

3         Counsel, as I sit here, I do not recall whether the

4    Court's approved jury questionnaire has been sent out or not.

5    If it hasn't, we need to do that.  I suspect it may have

6    already been done.  Can anybody enlighten me on that?

7              MR. CULBERTSON:  We have submitted a questionnaire,

8    Your Honor.  We actually submitted two.  We submitted one

9    before we recognized the Court's standing order had been

10   entered on jury questionnaires.  Subsequent to that, we

11   submitted one that complied with that order.

12             THE COURT:  All right.  I assume that's in process

13   somewhere.  What I simply wanted to make a note of this

14   morning is that I'll refer both parties to our Deputy in

15   Charge Ms. Clendening with regard to the juror questionnaires

16   when they come in, and she'll give you direction as to when

17   you can have access to those.  I'll remind both sides that the

18   practice in this court has always been that you are not to

19   retain any of the information on the juror questionnaires.

20   You're not to copy it, you're not to scan it, you're not to

21   keep it, and that includes emailing it to an offsite jury

22   consultant.  We tell citizens when they ask questions about

23   questionnaires that none of their information will be retained

24   by the lawyers on either side, so we insist on that.  Ms.

25   Clendening will make hard copies of those questionnaires

1    available to counsel at the same time, and she'll give

2    instructions on returning those printed copies so that she can

3    shred them.  But I'm just reminding everybody that in the

4    interim you're not to copy or retain or in any way duplicate

5    any of the information from those questionnaires.

6            MR. CULBERTSON:  Understood.

7            THE COURT:  All right.  Counsel, I'm hopeful we'll

8    get everything of a pretrial nature covered today, although I

9    have a telephonic Zoom meeting over the noon hour that will

10    probably go past 1:00, and then I'll have time this afternoon

11    to continue the pretrial, if necessary.  I've also -- so you

12    should know, I've also reserved tomorrow afternoon for

13    additional pretrial matters to be taken up by the Court if we

14    don't finish them today.  So depending on how fast we get

15    through everything, keep tomorrow afternoon open on your

16    calendars.

17        I'm also going to direct that the parties jointly

18    cooperate to prepare and deliver to chambers juror notebooks

19    for use in this case.  I'm going to direct that there be 12

20    copies of juror notebooks delivered.  These notebooks should

21    be simple three-ring binders that should include a complete

22    copy of the Patent in Suit, the '467 Patent; it should also

23    include a side-by-side chart reflecting the Court's claim

24    construction with any construed claim language in the

25    left-hand column and any adopted constructions from the Court

1    correspondingly situated in the right-hand column so that the

2    jury can look in a side-by-side fashion at the construed

3    language and see the Court's constructions or definitions.

4    Those are the only matters from the claim construction that

5    are to be included.

6         Beyond that, I'm also going to direct that these

7    notebooks include a section of tabbed witness pages so that

8    there be a separate page for each potential witness in the

9    case with a tab on it listing the witness' name so the jurors

10   can find it expeditiously.  Each witness page should have a

11   head-and-shoulders photograph of the witness superimposed at

12   the top of the page with their complete name underneath the

13   photograph.  While you're to include the complete name of the

14   witness, you're not to characterize the witness.  So, for

15   example, below the photograph it should say Dr. John Jones,

16   not Dr. John Jones, Plaintiff's damages expert.

17        The remainder of each of those pages should be ruled

18   lines for additional note-taking.  And in these notebooks

19   behind the tabbed witness pages, you should include a new

20   legal pad with three holes punched so it can be kept in the

21   notebooks.  And in the front pocket of each notebook you

22   should put a pen for note-taking.  Please make sure it is a

23   pen that does not click or otherwise make noise.

24        And as I say, those notebooks should be jointly prepared

25   through the efforts of both sides and delivered to chambers

1   not later than noon on Tuesday, June the 1st; again, 12 total

2   copies.

3        Counsel, are there questions from either side as to these

4   housekeeping instructions that I've given you?

5        MR. GILLAM:  Yes, Your Honor.

6        I'm not clear -- I'm not concerned about what the pecking

7   order is at this time, but does the Court intend on trying

8   more than one case in June?  And, if so, in case this case

9   were not reached the first week, is there a second week that's

10   going to be for trial in June as well other than the 7th.

11        THE COURT:  Well, that's a good question,

12   Mr. Gillam.  As some of you may know, I had a multi-week major

13   antitrust case scheduled for the first of June that was

14   specially set and then it settled recently.  At this point

15   I've taken a portion of that time and redesignated it for this

16   trial week.

17        If for any reason this case should not go with jury

18   selection on the 3rd of June and trial beginning on the 7th,

19   then there are other cases that I will anticipate filling that

20   space.  I don't think I have put out a designated order of

21   trial yet for that week.  I'll do that between now and then.

22   And I have not at this point designated a second trial week in

23   the month of June for another jury trial.  I have a

24   substantial bench trial that's a carryover regarding equitable

25   defenses from a prior jury trial that I'm scheduling in the

```
 1    back half of June.  Also Judge Schroeder from Texarkana has

 2    five percent of the Marshall non-patent civil docket, and he's

 3    got a case to try here in Marshall in the second half of June.

 4        So for those and other reasons, right now this trial week

 5    at the beginning of June is the first and only jury trial week

 6    I've got designated for June.  That's not to give you a

 7    written guarantee that another week won't be carved out, but

 8    right now the second half of June's pretty full with other

 9    things.

10              MR. GILLAM:  All right, sir.  Thank you.

11              THE COURT:  That's the best information I can give

12    you right now.

13              MR. GILLAM:  Thank you.

14              THE COURT:  Any questions from Plaintiff as to these

15    housekeeping instructions?

16              MR. CULBERTSON:  No, Your Honor.  Thank you.

17              THE COURT:  All right.  I do want to do one thing

18    before we get into the disputed substantive motions that are

19    set for today.  It's clear to the Court that we have multiple

20    Defendants in the case--AT&T mobility, Sprint, United

21    Management Company, T-Mobile USA, Cellco Partnership, d/b/a

22    Verizon Wireless, and then we have two Intervenors--HTC Corp.

23    and HTC America, Inc.  I'm assuming from everything I've seen,

24    counsel, that the Defendants are prepared to go forward in a

25    single trial and I should not expect an 11th hour demand to
```

1    assert your rights under Section 299 of the AIA.  But I'd like

2    to get the Defendants on record that we're looking at one

3    trial and I shouldn't expect any surprises in that regard.

4             MR. WILLIAMS:  Your Honor, Fred Williams for the

5    Defendants.

6        We're not going to argue that there's a joint requirement

7    of the AIA.  We did file a motion to sever it and stay to

8    simplify the trial, but I think that's separate from the

9    question the Court asked.

10             THE COURT:  Yes, it is.  I consider that a separate

11   question.  And we'll get to that motion to sever and stay

12   later.

13             MR. WILLIAMS:  Thank you.

14             THE COURT:  I'll take it, then, Mr. Williams, that I

15   should not expect any assertions of Section 299 between now

16   and the time we get a verdict.

17             MR. WILLIAMS:  Not by my law firm, Your Honor, or I

18   assume Mr. Gillam's.

19             THE COURT:  Okay.  Does that leave anybody out on

20   the Defendant's side or the Intervenors?  I just want to nail

21   this down tight.

22             MR. WILLIAMS:  Your Honor, forgive me.  I was

23   interrupted.  I didn't hear the Court's last question.

24             THE COURT:  I said does that include is the

25   Intervenors.  I want to make sure I've covered everybody on

1     the Defendants' side of the case.

2           MR. WILLIAMS:  Yes, Your Honor.

3        If I could inquire on a somewhat related question, will

4     the Court expect or require us to have a corporate

5     representative be here for each of the five to six Defendant

6     Intervenors.

7           THE COURT:  Well, we've got four Defendants and

8     we've got two Intervenors.  I would suggest we cross that

9     bridge with regard to the Intervenors once we've handled the

10    sever and stay motion.

11          MR. WILLIAMS:  Thank you, Your Honor.

12          THE COURT:  With regard to the four Defendants,

13    based on your representation that there aren't going to be any

14    assertions of Section 299 under the AIA issues, then I would

15    assume each of these four companies, which are pretty much

16    competitors in this space, are going to want their own

17    corporate representative here.  Do you anticipate having less

18    than a single representative for each Defendant present during

19    the trial for any reason?

20          MR. WILLIAMS:  I think it's possible that one or

21    more of the Carrier Defendants might be interested in that if

22    it's available because of COVID-related concerns, but I don't

23    have a request from them at this time.  I wanted to ask for

24    the Court's feedback.

25          THE COURT:  Well, let me leave it with you like

1    this.  It's the traditional and customary practice of the

2    Court that each defendant, corporate defendant, have a

3    corporate representative present throughout the trial.  If any

4    of the Carrier Defendants wish to seek leave to do something

5    different, they'll need to raise it with the Court

6    specifically.

7              MR. WILLIAMS:  Thank you, Your Honor.

8              THE COURT:  Okay.

9        All right.  As the parties are aware, there's been email

10   communication between the parties and Court staff about how is

11   the most efficient way to address the various disputes that

12   are before the Court as a part of the pretrial process, and I

13   am looking at a chart that was generated through those email

14   exchanges that has the disputed motions grouped into different

15   groups and in a proposed order of presentation and argument,

16   and there have been apparently some last minute updates to

17   that proposal from the parties.  The original proposal was

18   that the Court hear arguments on the summary judgment

19   regarding the marking statute, which is Docket 144, and that

20   was scheduled to be heard first, but I understand that the

21   parties have now reached agreement that the Court should

22   address that on the papers and neither side wishes to present

23   oral argument on that.  Is that correct?

24             MR. CULBERTSON:  That's correct.

25             MR. WILLIAMS:  Yes, Your Honor.

 1          THE COURT:  All right.  The second group in this

 2   order of attack, for lack of a better phrase, appears to

 3   relate to the matters of preclusion and related motions.

 4   Originally this was suggested by the parties to take up Docket

 5   No. 146, 152, 27, and 202 collectively.  However, I understand

 6   that Document 152, which is Plaintiff's motion to strike the

 7   summary judgment motion on preclusion, has been withdrawn by

 8   the Plaintiff, and also that the Defendants had withdrawn

 9   their opposition to the motion for leave to extend the

10   deadline to respond to a summary judgment motion, which is

11   Document 202, and that both of those are either withdrawn or

12   no longer opposed, leaving in this category the motion to

13   dismiss and the motion for summary judgment focused on the

14   preclusion issue.  Does that comport with the parties'

15   understanding?

16          MR. CULBERTSON:  It does, Your Honor.

17          MR. WILLIAMS:  Yes, Your Honor.

18          THE COURT:  Okay.  Then Document 152 is withdrawn

19   per the parties' agreement, and Document 202 now being

20   unopposed by the withdrawal of the opposition is granted as

21   unopposed.

22      And, quite honestly, I see no reason to separate the

23   argument on the motion to dismiss and the summary judgment

24   motion.  They substantively are largely overlapping.  So why

25   don't we take up argument on the issue of preclusion, Kessler

1    doctrine, and related matters concerning Document 146 and

2    Document 27.  And let me hear from the Defendants on this

3    first.

4             MR. WILLIAMS:  Thank you, Your Honor.  Fred Williams

5    for the Defendants and Intervenors.

6        We provided a couple of slides that I hope the Court has,

7    and provided to the court reporter.  If not, I've got an extra

8    copy.

9             THE COURT:  I have them.

10            MR. WILLIAMS:  Thank you, Your Honor.

11       I'll try to be brief on this, Your Honor.

12       Two bases for the motion.  First, I'd like to talk about

13   res judicata and claim preclusion.  The second slide just

14   contains the elements at the top for claim preclusion, which

15   is at issue here.  And I've highlighted the two -- provided

16   highlighting in the two elements where there is a dispute, I

17   think--privity, and whether this case presents the same claim

18   or cause of action as the first case which was tried I think

19   almost exactly three years ago this week.  That's the *Oreck*

20   *Direct* case, Fifth Circuit 2009.

21       Our motion does not raise issue preclusion, but I've

22   included the elements for issue preclusion here, because when

23   I read the Plaintiff's briefing it sounds like they're talking

24   about issue preclusion.  For issue preclusion, and the reason

25   we didn't move on issue preclusion, is the last element there

1    of -- for collateral estoppel, which is the issue in the prior

2    action must have been a part of the judgment in the earlier

3    action.  And as the Court is aware, there was an issue about

4    extraterritoriality in the first case, whether HTC Corporation

5    had performed any infringing acts.  That was part of that

6    first trial.  So that issue is different from what's at issue

7    in this trial because these Defendants are in a different

8    situation than HTC Corp. was for that limited purpose.

9        On our third slide is our argument, Your Honor.  The same

10   claim is involved in both cases.  Both cases involve the same

11   asserted patent.  Both cases accuse the same HTC phones of

12   infringement.  In fact, it's the same -- all of the

13   three-plus-million actual phones at issue in this case were

14   the subject of the prior trial.  Same phones.  And our

15   position is that that that is the end of the inquiry for same

16   claim or cause of action under Federal Circuit precedent.

17       Federal Circuit law applies to whether the same claim is

18   involved in both cases.  That's a citation to the *Senju*

19   *Pharmaceuticals* case.  In *Senju*, when the only dispute on res

20   judicata was whether the two cases involve the same claim, the

21   Federal Circuit analyzed two issues:  first, are the accused

22   products essentially the same in the two cases; and second,

23   are the asserted patents the same in the two cases.  The

24   answer to both of those questions in this case is yes, and so

25   our position is that where an accused infringer has prevailed

1    in an infringement suit, the accused devices that have the

2    status of non-infringement and the Defendant acquires the

3    status of a non-infringer to that extent.

4              THE COURT:  How can the non-HTC Corp. parties, HTC

5    Corp being a Taiwanese foreign corporation, how can the

6    non-HTC Corp. parties be deemed to be non-infringers when a

7    large part of the substantive defense asserted by HTC Corp. in

8    the 216-CV-1096 case, which we'll call Salazar One, was that

9    HTC Corp. was not an infringer because its acts took place

10   outside the United States?  I mean, without a finding that the

11   HTC products read on each and every element of the asserted

12   claims, which there is no direct finding of that, how can

13   these non-HTC parties at this point say they are fully and

14   properly deemed to be non-infringers vis-a-vis the judgment on

15   Salazar one?

16             MR. WILLIAMS:  Our response is res judicata extends

17   to the entire claim.  It extends to claims that were or could

18   have been litigated in the first case.  There's ample evidence

19   that Salazar's counsel was aware of these other entities at

20   least by the trial and, in fact, before -- the deadline for

21   joinder of new parties in the first case.

22             THE COURT:  Isn't there, Mr. Williams, a requirement

23   of privity in this situation?

24             MR. WILLIAMS:  There is, Your Honor.  I'd like to

25   talk about privity.

1       In this situation, the other element is privity.  Again,

2   all of Mr. Salazar's allegations focus exclusively on these

3   Defendants' resale of the same smartphones.  Privity extends

4   to non-parties whose interests have been so closely aligned to

5   the party in the first case that that party is deemed to be

6   its virtual representative.  So the issue is was HTC Corp. a

7   virtual representative for the Defendants in the first case;

8   did it adequately represent their interests.  Distributors and

9   customers are regularly found to be in privity.  We've briefed

10  some of those cases for the Court.  All of these Defendants

11  were well-known resellers of the HTC Corp. smartphones and had

12  contracts, including indemnity and warranty provisions about

13  third-party infringement claims.

14      So HTC defended the first case, obtained a judgment of

15  non-infringement adequately represented the Defendants, and so

16  we would submit that that constitutes privity and we have

17  significant evidence of privity, Your Honor.

18          THE COURT:  Let me ask this with regard to the

19  privity issue.  Whether we call it HTC One or Salazar One,

20  that's the 216-CV-1096 case, in that case, as you say,

21  approximately three years from now having been tried, HTC, the

22  foreign corporate sole defendant in that case, submitted a

23  proposed jury verdict to the Court which took the liability

24  issue and proposed it be asked as two separate questions--the

25  first, did HTC sell or offer for sale products in the United

1    States or import them into the United States, asserting the

2    everything-took-place-offshore defense; and then HTC proposed

3    a second question that if the first question was answered

4    properly, then the second question would be answered finding

5    did the accused products read on and meet each of the

6    limitations of the asserted claims of the direct infringement,

7    literal infringement question.

8         At the conclusion of the charge conference, the Court

9    made it clear to both Salazar and HTC that it was going to

10   combine those two proposed questions from HTC into a first and

11   a single liability question on the verdict form which asks,

12   "Did Salazar approve by a preponderance of the evidence that

13   HTC infringed any of the asserted claims to the use, sale, or

14   offer for sale in the United States or importation into the

15   United States of any of the accused products?"  And HTC did

16   not object to that question at the charge conference.  And

17   I've actually pulled the transcript from the charge

18   conference, and it's abundantly clear that there was no

19   objection to that modification by the Court of the first

20   question in the verdict form in Salazar One by HTC.

21        The result is we now have a verdict in HTC One or Salazar

22   One where HTC presented a strong defense that it did not

23   commit infringing acts within the United States.  It

24   alternatively presented a defense that if its acts did occur

25   in the United States, then they did not meet each and every

1    element of the asserted claims and there wasn't literal

2    infringement.  The verdict that we have and the resulting

3    judgment doesn't tell us if the jury based its decision on a

4    direct literal infringement analysis or if the jury found no

5    infringement because it believed HTC's defense that the acts

6    as asserted did not occur within the United States.  And we

7    have that because HTC didn't object to the verdict form at the

8    formal charge conference.

9        So you have the burden of establishing preclusion now

10   under this motion.  How can you meet that burden based on the

11   prior judgment and the verdict form that gave rise to that

12   judgment when we don't know which of those two bases the jury,

13   whether it was one, whether it was the other, or whether it

14   was both, and there's no way that you can establish in my mind

15   that the jury found no infringement because of a

16   claim-by-claim analysis finding that the accused products did

17   not read on the asserted claims, which I think you would have

18   the burden of establishing if you were going to prevail on the

19   preclusion issue.

20       That's the big problem I see with your preclusion motion,

21   and I want to lay it out in detail so that you know exactly

22   what the question in the Court's mind is and give you an

23   opportunity to try to address that.

24           MR. WILLIAMS:  Thank you, Your Honor.

25       If we were moving on issue preclusion, I agree that would

1    be dispositive of the motion.  On claim --

2              THE COURT:  That doesn't go to the privity issue as

3    well?  That same scenario doesn't impact the privity issue?

4              MR. WILLIAMS:  I haven't thought about that one,

5    Your Honor, but I'll get to it in a minute.

6         For res judicata, the issue is is this the same claim.

7    The first issue is is this the same claim.  And clearly,

8    regardless of which question the jury was answering, this

9    clearly is the same claim.  It's the same patent and the same

10   accused products under *Senju*.  I believe that's the same

11   claim.

12        On the privity issue, we have this substantial evidence

13   of these Defendants working hand-in-glove with HTC to approve

14   product specifications, train their salespeople, and indemnify

15   and provide warranties.  That looks like privity.  Does the

16   combination of the two questions affect privity?  I'm not sure

17   I see how it does, Your Honor.  Can you help me?

18             THE COURT:  Well, if the Defendants in the first

19   case were HTC and HTC America, then I don't think there's much

20   doubt that HTC America and HTC Corp. are in privity with each

21   other.  But the relationship between HTC Corp., a Taiwanese

22   company, and these Carrier Defendants who buy components from

23   multiple vendors, HTC being one of them, and yes, as in most

24   contractual arrangements or commercial relationships, there

25   are contractual obligations or for indemnity, but I don't know

1   how that creates a legal privity between HTC as a foreign

2   company and the Carrier defendants who in the stream of

3   commerce buy components from them.  Otherwise, everybody that

4   buys anything from anybody would be in privity from a legal

5   sense with the seller of those components.

6       MR. WILLIAMS:  I think this is a different factual

7   situation than when I go into a department store and buy a

8   product because of the master purchase agreements between HTC

9   Corp. and the Carriers.  I remember Mr. Tindel at trial making

10  a very forceful argument that the fact that HTC Corp. had

11  signed these contracts with the Carriers constituted a sale in

12  the United States.  I remember that part of the case as well.

13  Not just the indemnity provisions, but their hand-in-hand

14  coordination and their regular meetings between Carriers and

15  HTC to chart the path of these products we would submit

16  establishes privity.  But I'm not sure I persuaded the Court.

17      THE COURT:  Well, I think at the end of the day the

18  privity issue comes down to whether the interests of the

19  parties alleged to be in privity are so closely aligned that

20  it's fair to apply preclusion to the benefit of a non-party.

21  And are these Carriers and HTC Corp., are their interests so

22  commonly aligned that it's fair to apply preclusion to these

23  Carriers when structurally, corporately, legally there's no

24  legal relationship between them, perhaps other than whatever

25  contractual obligations in the stream of commerce they have to

1    buy and sell components between each other.  I mean, that's

2    the question I think at the end of the day--is there a factual

3    alignment that's of such degree that makes it fair to apply

4    that preclusion defense.

5         And when I look back at Salazar One and HTC One, there

6    are several ways in which HTC tried that case that are not

7    with an eye toward being closely and intimately aligned with

8    the Carrier Defendants.  I think, to be honest, there is some

9    element of hindsight here that the Carriers are trying to

10   apply to what happened three years ago when they weren't

11   involved in it, and trying to characterize the conduct of the

12   single foreign defendant in that trial as being aligned and in

13   privity with their interests, when that was probably not a big

14   thought on anybody's mind three years ago when this Taiwanese

15   company was defending itself against infringement allegations

16   at trial in this court.

17        So I think we're all on the same page as to what the

18   ultimate question is.  It's just a matter of do the facts from

19   the prior litigation rise to the level that make it fair to

20   afford your client the benefit of what they're seeking.

21        MR. WILLIAMS:  Understood, Your Honor.  I would

22   submit that I think there's room in the case law to argue that

23   a party that's seeking to apply preclusion defensively, a

24   non-party to the first case, that's a lower burden than a

25   non-mutual offensive application of preclusion, and so it

1    might require a lower showing of privity than if the roles

2    were reversed.

3         I would also submit that under the Kessler doctrine, no

4    privity is required.  We believe the analysis is the same.  In

5    the absence of a privity requirement, there's a claim --

6    clearly the same claim under the Kessler doctrine.  All claims

7    that were litigated or could have been litigated are

8    precluded.

9         And I would point out just that, you know, this was a

10   tactical decision on the part of Salazar.  They knew about HTC

11   America.  They knew about all of these Carriers.  They chose

12   not to add HTC America and the other Carriers to the case.

13             THE COURT:  And HTC America didn't seek to intervene

14   in the case.

15             MR. WILLIAMS:  That's correct.

16             THE COURT:  The knife cuts both ways.

17             MR. WILLIAMS:  That's correct, Your Honor.

18             THE COURT:  With regard to the Kessler doctrine, at

19   the time the current action was brought, the Patent in Suit

20   has expired.

21             MR. WILLIAMS:  Yes, Your Honor.  All acts of

22   infringement occurred before the first case was filed.  The

23   patent expired before the first case was filed.

24             THE COURT:  And at a high level, my understanding of

25   the Kessler doctrine is it's meant to fill the gap after a

1    judgment for acts that would otherwise not be covered and

2    might have been -- be in a different posture.  I have -- I'm

3    not sure that the policy behind the Kessler doctrine fits in

4    this case where we've got an expired patent.  I'm not sure

5    where the gap is that would be filled here.

6                MR. WILLIAMS:  Our reading of the cases is that

7    there certainly are some cases where indicta or in shorthand

8    there's a reference to some kind of temporal limitation to the

9    Kessler doctrine.  We found at least one Federal Circuit case

10   where it appears they applied the Kessler doctrine without

11   distinguishing between before and after the judgment in the

12   first case.  I haven't found a case that says absolutely that

13   you can't apply the Kessler doctrine to prejudgment conduct,

14   conduct from the -- that predates the prior judgment.  And I

15   think that's because generally res judicata takes care of

16   that, and so the Kessler doctrine is called in usually for

17   later conduct or when there's not clear privity.

18                THE COURT:  All right.  What else do you want to

19   cover with the Court, Mr. Williams, that we haven't on this

20   issue?

21                MR. WILLIAMS:  That's all I have, Your Honor.  Thank

22   you.

23                THE COURT:  Let me hear a response from Salazar.

24                MR. KEYHANI:  Yes, Your Honor.

25           Your inquiry regarding the issue of privity is, as far as

1    Salazar is concerned, the Plaintiff is concerned, is on point.

2    If you look at the entire transcript of the trial in Salazar

3    One, if you look at the entire ways in which HTC Corp.

4    defended itself through the discovery process, on early

5    motions in the case, it is abundantly clear that the interests

6    and the rights with respect to -- or the liability, let's say,

7    with respect to this patent and the Carriers was not part of

8    the defense.

9         I mean, when we -- when Salazar attempted to bring in the

10   carriers, HTC Corp. took the position that Section 299

11   applied, and so they couldn't even bring in AT&T or even AT&T

12   Mobility.  There was an issue about the party identified in

13   Salazar's motion to amend, but then HTC Corp. took the

14   position that even AT&T Mobility was not appropriate, could

15   not be joined; it was such a separation of transactions and

16   that they could not be joined.

17        And, you know, where we're talking about privity and you

18   look at the case law and how the courts under *Senju*, and this

19   Court actually very recently--we cite to it in our sur reply

20   in the summary judgment briefing--the *Oyster Optics versus*

21   *Cisco Systems* that just came out a few weeks ago, citing to

22   *Senju* and acknowledging the Fifth Circuit and then the more

23   specific Federal Circuit law, that you got to go under the

24   hood; you got to look at the facts.  It's not just is it just

25   a superficial same patent, same claim; what exactly happened.

```
 1          And I think the Court, looking into the jury
 2   instructions, and we do recall that, and HTC not delineating
 3   the two issues.  As the Court points out, the issue of a
 4   foreign sale, whether the sale occurred in Taiwan or the
 5   United States versus the existence of the claim elements.  If
 6   HTC corporation was truly the virtual, quote unquote,
 7   representative of the Carriers, AT&T and others, wouldn't they
 8   want delineate that issue?  Wouldn't they want the jury to
 9   rule on that so there would be issue preclusion?  And then
10   there also would be claim preclusion because they would be
11   acting to protect the Carriers.  By allowing these issues to
12   be merged into one jury instruction, they did benefit
13   strategically because what they gave the jury--and I'm not
14   going to, you know, go through the language of the transcript;
15   it's in our briefing--they made the argument to the jury, not
16   as a peripheral argument but as a separate independent
17   dispositive argument that, you know--I'm paraphrasing--ladies
18   and gentlemen of the jury, if you don't find the issue, you
19   know, non-infringement because the claim elements are not
20   there, you have a separate basis, a separate basis to let HTC
21   Corp. out, and that's because there was no sale in the United
22   States.  And they went through invoices, if you recall, Your
23   Honor, where they showed that these sales had consummated --
24   the HTC sales had consummated in Taiwan and not the United
25   States.  And what we're really talking about on the issue of
```

1    privity, well, this goes to the issue of were they acting as a

2    virtual representative.  Were there -- as the Court aptly

3    pointed out, were the interests aligned.  If the interests

4    were aligned, then you would have protected at every juncture

5    this distinction.

6        Now, as a separate related issue that is required for

7    claim preclusion--is it the same transaction.  Well, Your

8    Honor, as we briefed and we submit to the Court, how is it

9    possible that a transaction occurring in Taiwan that is not

10   covered by U.S. law, a sale or offer for sale in Taiwan--which

11   is what HTC Corp. argued unequivocally, presented evidence in

12   the prior case--could be equal to the same offer for sale and

13   sale in the United States which is subject to American law?.

14   One is actually outside the scope of the U.S. law and one is

15   within the scope of U.S. law.  One is not -- one action does

16   not create any liability because it would be only covered by

17   Taiwanese patents, the existence of which or not.

18       So there is no way that one could argue when you look --

19   whereas this Court noted and as the Federal Circuit has noted

20   under *Senju* and progeny and Fifth Circuit's application of the

21   principles -- general principles of claim preclusion that a

22   pragmatic and careful inquiry of the facts make crystal clear,

23   Your Honor, that the sale -- a transaction offered for sale or

24   sale of an accused product in Taiwan--that the Defendants

25   enjoyed the benefit as an argument and enjoyed the verdict

1    district on, at least in part or in whole--cannot be the same

2    transaction as a sale or offer to sell these products in the

3    United States.

4        And I think that's where the issue of whether this is the

5    same cause of action or the same claim falls because they

6    simply cannot be the same cause of action because it is a

7    separate set of transactions and it is a separate nucleus

8    operative fact.  In fact, it is so separate that one is

9    covered by American law, U.S. law, and one is not covered by

10   U.S. law.

11       And so from a transactional perspective, when you go

12   under the hood, when you get pragmatic and have a careful

13   inquiry and you look at it holistically and you look at it in

14   detail, you see that this could not be the two separate

15   transactions they're talking about.

16       And this argument is not -- was actually originally

17   poised by -- it was presented by HTC Corp. itself when we

18   tried to add the Carriers -- when Salazar, I'm sorry -- tried

19   to add the Carriers, and they said this is Section 299 because

20   this is a separate transaction.

21       You know, not to mention, you know, the Defendants -- you

22   know, and this has been briefed.  You know, early in the case

23   in the prior case, HTC Corp. -- when the issue of adding the

24   Carriers, the deadline to add additional parties was arriving,

25   early in the case in Salazar One, HTC Corp. refused, refused

1    to produce these agreements that it had with the Carriers.

2    And Salazar never had the benefit of those agreements to argue

3    even to look at those agreements.  And the Court ruled on this

4    issue in the prior case that Salazar could not enjoin AT&T or

5    -- AT&T Mobility couldn't be joined, AT&T couldn't be joined,

6    relying on the representations of HTC Corp.

7         Later, of course, Salazar filed a motion to compel and

8    the Court ordered HTC Corp. to produce those master

9    agreements; those master agreements that now HTC Corp. argues

10   this shows privity.  Salazar didn't have the benefit of those

11   agreements.  I don't think -- I happen to agree with Your

12   Honor that I don't think those agreements that are general

13   business agreements or sale agreements, general -- they

14   weren't specific sale agreements; they were general sale

15   agreements by themselves and are dispositive of the issue of

16   privity.  You have to look at the details of the parties'

17   transactions and actions.

18        And it's clear that -- I think from the record and from

19   HTC Corp's own arguments in Salazar One that they were not

20   acting under -- a sine qua non of a privity argument is were

21   you -- as the Court put it, were the interests truly aligned,

22   and were you acting as their virtual representative.  And I

23   think in hindsight perhaps there's no -- I can understand why

24   they're arguing that now, but in the prior case on many

25   occasions, even at the end when the jury came back on the

1   issue of validity and did not decide the issue of validity,

2   and the Court asked whether you want to send this back; Your

3   Honor asked whether you want to send this back to the jury.

4           THE COURT:  I remember that quite well.

5           MR. KEYHANI:  What was -- if you're trying to

6   protect virtual representative Carriers, you would be like,

7   Well, I'd like to knock this patent out, I would think.  If I

8   was representing the HTC -- you know, the Carriers, I'd say,

9   Wait, hold on a second, let's get the patent put aside because

10  we don't want any problems; you know, we're going to be

11  liable.  But they chose to withdraw that.

12      Again, I think the strategy was, on the part of HTC Corp.

13  if we had this extra argument -- just in case the jury

14  doesn't, you know, agree with us that the claim elements are

15  not there, we get the strategic benefit that they have a

16  separate basis to let us free.  That was a strategic,

17  advantageous position to take.  And I can understand that

18  position.  One can understand that strategic position.

19      But there was a cost to take that position, and the cost

20  wasn't on HTC Corp.  HTC Corp. was cleared.  The cost of that

21  was on the Carriers.  And if the Carriers' interest was truly

22  being represented in HTC One, the virtual representative or

23  the representative, the true representative would have taken

24  the position of, Hold on, we need to make sure that this

25  verdict sticks for all of us.  And Your Honor, we submit that

```
 1    it was not -- it was not set out in a way that it would stick,

 2    and that was on the burden of HTC Corp. to protect -- if that

 3    was their client, quote unquote, it was their responsibility

 4    to protect their client.  And they chose to go with HTC Corp.

 5    and to give HTC Corp, as was put in the closing arguments by

 6    HTC Corp., yet another independent basis to dispose of the

 7    case.  That decision had a cost and the cost was at the

 8    Carriers' expense, Your Honor.

 9              THE COURT:  All right.

10              MR. KEYHANI:  I have no further comments.

11              THE COURT:  Thank you.

12              MR. KEYHANI:  Thank you, Your Honor.

13              THE COURT:  Mr. Williams, do you have anything else

14    on this?

15              MR. WILLIAMS:  Not unless the Court has a question,

16    Your Honor.

17              THE COURT:  No.  I will note that when -- during

18    Salazar One when the verdict was returned showing that the

19    jury had answered the infringement question but had not

20    answered the invalidity question, I called counsel to the

21    bench and made that clear, and asked the parties, particularly

22    the Defendant who was asserting invalidity, if I should send

23    the jury back to the jury room and instruct them to answer the

24    invalidity question or should I accept the verdict as it was;

25    and counsel met and conferred, came back to the bench, and
```

1    told me to accept the verdict as it was.

2        I understand that's not a waiver of the invalidity issue,

3    and I have and have had for some time, proposed findings of

4    fact and conclusions of law on that issue.  And, quite

5    honestly, with the advent of COVID and the Court's caseload

6    being effectively put in a blender and pushed on high, I have

7    not gotten a ruling out on that.  You can expect a ruling

8    shortly.  I know I owe you that.  And I will just tell you

9    now, the Court is not going to find that the patents are

10   invalid.

11           MR. WILLIAMS:  Understood, Your Honor.

12           THE COURT:  So I think we're all arguing this issue

13   as if that's the result, but I want to make it clear where we

14   really are.

15           MR. WILLIAMS:  Thank you.

16           THE COURT:  If you have anything else on this,

17   Mr. Williams, I'll be happy to hear it.  I really think this

18   is the -- not most important, but it is a key issue in the

19   dispositive motion practice that we have today and it

20   certainly stands out from the typical non-infringement MSJ and

21   the other things that we have yet to take up.

22           MR. WILLIAMS:  I would just submit one other

23   thought, Your Honor.  We presented a substantial defense at

24   the first case on invalidity and non-infringement.  And when I

25   say non-infringement, I'm talking about do the phones do what

1   these claims require.  I can't agree with Mr. Keyhani's

2   characterization that that was peripheral to the

3   extraterritoriality issue, but I would submit that we

4   adequately represented the Carriers' interests even though we

5   did not represent them in fact at the time, including on

6   non-infringement and invalidity.  A reasonable Carrier, had

7   they been in the room when the jury came back, might also have

8   made the same tactical decision on the invalidity claim that

9   HTC did, which was accept the verdict on non-infringement and

10  have the Court address the invalidity claims.  That to me does

11  not indicate a lack of privity.  Those were strategic issues.

12  The extraterritoriality issue was an issue that was unique to

13  one particular defendant.  The fact that HTC Corp. pursued

14  that defense I would submit does not make it -- does not make

15  its status as a virtual representative in the first case any

16  lesser.

17        Thank you, Your Honor.

18            THE COURT:  Thank you.

19        Well, to be candid, counsel, I said in preparation for

20  the hearing today when I looked at this not only are lawyers

21  required to cover all the interests of the parties as they try

22  lawsuits; we're now supposed to cover the interest of parties

23  who aren't in the lawsuit when we try to lawsuit.  I'm very

24  glad I'm on this side of this issue and not out there at

25  counsel table.

1        I do not fault counsel in Salazar One on the Defendants'

2    side.  They put on a strong defense and they walked out of the

3    courtroom without their client being liable.  So -- but does

4    that mean in the light of day three years later that there is,

5    in fact, a level of a common alignment between these Carrier

6    Defendants and HTC Corp. that would fairly allow these Carrier

7    Defendants to receive the full benefit of a complete,

8    preclusive preclusion defense.  And at the end of the day, the

9    Court is not persuaded that there is the level of alignment

10   necessary to impart that significant defense to the Carriers

11   in this case, and I'm going to deny the motion to dismiss,

12   Document 27, and I'm going to deny the MSJ on preclusion,

13   Document 146.

14       All right.  Let's move onto the third category as

15   identified by the parties for argument today, which is the

16   motion for summary judgment brought by the Defendants of

17   non-infringement, Document 143.

18       Let me hear from the moving Defendants.

19           MR. LANDIS:  Good morning, Your Honor.  Todd Landis

20   for Defendants.

21           THE COURT:  Good morning, Mr. Landis.  Please

22   proceed.

23           MR. LANDIS:  Your Honor, I think there are two live

24   issues with this motion.  There were three issues briefed, but

25   I think on the willfulness issue, if I read Plaintiff's

1    response correctly, they have withdrawn the willfulness issue

2    now.  So the live issues I think are the motion for summary

3    judgment and non-infringement of the memory elements of Claim

4    1 of the '467 Patent and motion for summary judgment on

5    doctrine of equivalents.

6              THE COURT:  Let me hear your argument.

7              MR. LANDIS:  On the issue of non-infringement in the

8    memory element, Your Honor, the '467 Patent's memory element

9    requires that the memory device be configured to store

10   parameter sets.

11       Before I get to the Court's construction, I'd like to

12   just go over some facts that are undeniable.  HTC's phones

13   have memory.  That's an undeniable fact.  Part of that memory

14   is set aside for an operating system for the phone.  That is

15   also an undeniable fact.  But the rest of the memory in the

16   phone, much like the phone in my pocket here, is set aside for

17   any purpose any time.  It is no different that if you have a

18   thumb drive or you have some other type of hard drive that

19   maybe has encryption software on it.  It will have an

20   operating system; take a portion of the memory.  The rest of

21   the memory can store anything.

22       The parties agreed to adopt the Court's construction from

23   Salazar One.  The Court entered that construction.  That

24   construction of configured to is some particularized

25   arrangement of the memory device for a specific purpose.  In

1      the claim, the specific purpose is storing parameter sets.

2           It is also undisputed in this case that none of the

3      phones when sold have the IR codes that are being claimed to

4      be the claimed parameter sets.  None of them have them on the

5      phones.

6           Doctor Gottesman opines that because the device's memory

7      can simply store anything, that there has somehow been a

8      particularized arrangement to store parameter sets.  But

9      memory is memory.  It's not particularly arranged to store

10     anything.

11          An example would be, Your Honor, my phone has the

12     Microsoft Word application on it.  It's not particularly

13     arranged in its memory to store any Word documents until the

14     Word documents are created and Microsoft Word asks the phone

15     to store them.  There's no arrangement of memory for storing

16     Word documents.  There is an arrangement of memory for the

17     program, but the program itself doesn't have the Word

18     documents.

19          It's the same thing here.  When the applications that

20     we're discussing in this case, the Sense TV application, the

21     Peel application, when they're put on the phone their code is

22     on the phone.  The code itself does not have any IR codes with

23     it.  There are no IR codes on the phone.  There is no memory

24     that has been arranged to store those IR codes because the

25     memory hasn't been asked to store them.  The portion of the

1    memory that is available for storage doesn't even really know

2    those applications exist until it is asked to do something,

3    and that occurs after the phone is sold.

4        In essence, Doctor Gottesman is saying the phone is

5    capable of storing stuff but not configured to, and the claim

6    requires it be configured to; have some particularized

7    arrangement of the memory for a specific purpose; and the

8    phones at issue here when sold do not have that with respect

9    to the applications and the IR codes.

10       That's all I have on that portion of the motion, Your

11   Honor.

12           THE COURT:  Let me hear your position on the

13   doctrine of equivalents.

14           MR. LANDIS:  Your Honor, on the doctrine of

15   equivalents, our position is fairly simple.  There has been no

16   analysis of the doctrine of equivalents.  There is a

17   conclusory statement that Doctor Gottesman puts in his report

18   that if you don't -- if the jury doesn't find literal

19   infringement, there would be doctrines of equivalents, but he

20   doesn't do any function/way test analysis, he doesn't do any

21   of the other analysis that's required under the law on

22   doctrine of equivalents, he doesn't look at any insubstantial

23   differences between the claimed invention and the actual

24   accused devices.  He hasn't done any of that.

25       On page 17 of our brief, Your Honor, we put in the quote

1    from Doctor Gottesman's report; one example of a quote.  That

2    same example is used each time he talks about the doctrine of

3    equivalents.  But for each element he mentions the doctrine of

4    equivalents but doesn't always give an explanation.  When he

5    does give an explanation, it's a conclusion; it has no

6    analysis of the actual test.

7         And for those reasons, when you look at the case law and,

8    in particular, the *AquaTex Industries* case, which is at

9    479 F.3d, and the pin cite here will be 1328, Your Honor, the

10   Federal Circuit said, "Generalized testimony as to the overall

11   similarity between the claims and the accused infringer's

12   product or process will not suffice."  And they were talking

13   about the doctrine of equivalents.  That's what we have

14   here--generalized testimony, nothing specific.

15        That's all I have, Your Honor.

16        THE COURT:  All right.  Thank you, Mr. Landis.

17        Let me hear a response from Plaintiff.  Please proceed,

18   Mr. Keyhani.

19        MR. KEYHANI:  Thank you, Your Honor.

20        The arguments that Mr. Landis raises on behalf of the

21   Defendants is simply a dispute of fact.  These are the

22   opinions of the Defendants.  These are the opinions of their

23   expert.  Doctor Gottesman lays out numerous levels or various

24   levels of configuration.  In their briefing, Defendants argue

25   that Doctor Gottesman needed to show allocation of memory.  He

1    needed to show that special arrays, you know, were allocated

2    and so on and so forth; that the -- that only parameter sets

3    could be, you know, stored in a particular -- in a particular

4    compartment.

5        And the Court's claim construction or the Court -- the

6    claim construction that the Court adopted from Salazar One, it

7    simply states, and the parties agreed to, a particularized --

8    the memory device limitation, or so-called memory device

9    limitation, is really a particularized arrangement for a

10   particular purpose.  It doesn't speak about --

11       I mean, another point is they say Doctor Gottesman

12   doesn't talk about the specific amount of gigabytes that are

13   being stored or -- that's not true.  He actually addresses

14   that.  But even if that was the case, that's not what the

15   construction requires.

16       And Doctor Gottesman, for example, page 6 of Plaintiff's

17   opposition, sets out in detail multiple layers of memory

18   configuration.  For example, he talks about at the hardware

19   level and how the communication between the Snapdragon

20   microprocessor and the memory device creates all the

21   communications and the configuration creates a level of

22   particularized arrangement for the purpose of storing -- you

23   know, storing the parameter sets.

24       He talks about, you know, the software partition of the

25   flash compartment into the OS and data compartmentalization.

1    And then finally, Doctor Gottesman speaks about how the

2    installation of the applications themselves, the Peel

3    application and the Sense TV application, which the phones

4    come in with the application installed, is another level of

5    software compartmentalization particularized arrangement for

6    the purpose -- and in the case of the installation of the

7    applications, the installation of these specific applications,

8    the Sense TV application and the Peel application, are

9    specifically for the -- it's a specific configuration for the

10   storing of the parameter sets, because that's what these

11   systems are to help the phone to do--recreate demands, to

12   communicate with external devices.

13   So there are multiple levels of configuration, whether

14   one would think the one -- they are -- one of these levels is

15   not needed, whether the hardware configuration is not

16   sufficient, whether the software, you know, configuration is

17   necessary, that's a question -- a dispute of fact, and these

18   experts clash over that.  I mean, this is --

19   But this is not an area that Doctor Gottesman touches

20   upon lightly.  He points out with figures, with drawings, with

21   details, and with respect to even the amount of configuration

22   he points out that 23 gigabytes in his report is what is, you

23   know, set aside for memory, for flash allocated memory.

24   Now, it is argued, Well, it has to be for parameter sets.

25   Well, the claim Defendants argue that the configuration must

1    be for these special arrays or allocation of parameters.

2    Well, the claim -- the construction of the claim simply says

3    "a particularized arrangement for a particular purpose," and

4    clearly Doctor Gottesman on multiple levels with a lot of

5    support, source code, hardware, software, points to these

6    various levels of partitioning and of allocation or

7    particularized arrangement of memory.

8         And the notion that a partitioning--which is argued also

9    in Defendant's briefing--that a partitioning of the memory at

10   any one of these levels that Doctor Gottesman speaks to does

11   not meet the claim element is not supported by the claim

12   construction, and partitioning the memory device, any kind of

13   partitioning is making a particularized arrangement.

14        And the installation of the application, Doctor Gottesman

15   opines in his report, installation of the HTC Sense TV

16   application and the Peel application themselves are creating a

17   particularized arrangement in the memory device for the

18   specific -- very specific purpose of storing parameter sets,

19   and that is as specific and as precise of a particularized

20   arrangement within the memory device that you can have for the

21   very specific purpose.  And these products are sold with these

22   applications installed, so nobody -- the customer doesn't have

23   to install the applications; the applications are already on

24   there.

25        So what we're talking about here is really a question of

1     a clear classical dispute of fact about whether or not what's

2     going on in these phones, whether the memory device has been

3     particularly arranged for a particular purpose, Doctor Wolfe

4     defends the position.  They say it's not that these certain

5     things have to happen.  Doctor Gottesman, who lays out in

6     significant detail his analysis and in multiple layers of

7     configuration and variations of configuration has -- disputes

8     that fact.

9              THE COURT:  Anything further?

10             MR. KEYHANI:  I'd like to address the doctrine of

11    equivalents.

12             THE COURT:  Okay.

13             MR. KEYHANI:  The doctrine of equivalents is an

14    equitable principle in patent law, as Defendants are fully

15    aware, and there are at least -- the courts have said there

16    are at least -- the Federal Circuit and the long line of

17    precedent has stated that there's at least two ways that you

18    can show the existence of the doctrine of equivalents.

19    There's a classic or the well-known, substantially the same

20    function/way result, which is often discussed.  And Doctor

21    Gottesman in his report for certain claim elements, for

22    example, the memory device configuration, the microprocessor

23    limitation, he talks about substantially the same

24    function/way/result language and some other aspects, but

25    there's also the insubstantial difference doctrine of the

1    doctrine of equivalents.  If you can show that there are

2    insubstantial differences between the claim language and the

3    elements found in the accused system, that also is a form of a

4    doctrine of equivalents argument.

5         So you don't have to -- there's not a magic bullet here,

6    and the courts have used the word, sort of the the wholesome

7    realism, the wholesome realism that is this really the same

8    for all practical purposes.  And that's all the doctrine of

9    equivalents attempts to protect against; some insubstantial

10   differences that are made that are without a pragmatic

11   practical distinction.  So there's no magic language.

12        Doctor Gottesman's report is 127 pages, Your Honor.  I

13   have it in my hand here.  And he goes into great detail, not

14   only in the areas where he uses the magic words which we've --

15   you know, of -- that are being argued by the

16   Defendants--substantially same function/way/result language,

17   which is one commonly used way to talk about doctrine of

18   equivalents--he talks about the insubstantial differences that

19   may exist that Defendants, that Doctor Wolfe may be arguing,

20   you know, in the case, and that those are not going to create

21   a situation where these products can be deemed not to be

22   infringing.  And so you can't just look for that language and

23   cut and paste where you have the words function/way/result;

24   you have to look at the deep and detailed and depth of

25   analysis that Doctor Gottesman gets into his report, you know.

1        And within the discussion of literal infringement, or

2   within the discussion of infringement generally, he gets into

3   various ways in which, for example, for example, I just -- we

4   just had a moment ago a discussion of configuration of the

5   memory device, and Doctor Gottesman provides at least three

6   different variations of configuration of the memory device.

7   He didn't use the word -- and then he goes on to talk about

8   substantially same function/way/result, but his discussion of

9   three different ways of configuration is another way of

10  showing that it's not a literal thing here; there could be

11  something -- there are substantial ways; there are different

12  ways in which you can literally or under the doctrine of

13  equivalents from a wholesome, pragmatic perspective deem these

14  -- this memory device to meet the claim element.  And so the

15  notion that, Oh, there's just a few paragraphs or asserted

16  paragraphs that they're challenging on the *Daubert* because

17  they use the word substantially same function/way/result, it's

18  more than that, it's more sophisticated than that and, again,

19  you've got to go to under the hood and look at does Doctor

20  Gottesman --

21        THE COURT:  Would you slow down just a little bit,

22  Mr. Keyhani?

23        MR. KEYHANI:  I apologize.

24        THE COURT:  Thank you.

25        MR. KEYHANI:  You have to look under the hood and

```
 1    see has Doctor Gottesman, Plaintiff's chief technical expert

 2    for infringement, has he carefully unwrapped and looked at the

 3    various ways in which these elements at issue are met and

 4    looked at various ways in which insubstantial differences

 5    could also meet the claim element.  And unequivocally, Your

 6    Honor--and Your Honor I believe has a copy of this report,

 7    should have it in the briefing--but if you read through this

 8    and you look through this and you read through every element,

 9    it's there.

10        And that's all I have to say, Your Honor.

11             THE COURT:  All right.

12             MR. KEYHANI:  Thank you.

13             THE COURT:  Mr. Landis, do you have anything else?

14             MR. LANDIS:  If I may, Your Honor.

15             THE COURT:  I Don't need to hear it again, but if

16    it's something new you haven't said, I'm happy to hear it.

17             MR. LANDIS:  Well, Your Honor, I want to talk about

18    -- I think I just heard Mr. Keyhani say, and maybe I

19    misunderstood him, but I heard him talking about Doctor

20    Gottesman's three variations of how this element is met, and

21    then I heard him say, and I wrote it down, "The three

22    variations are not a literal thing," but it's in his little

23    infringement section.  So is it a literal thing or is it an

24    equivalent thing, and that's the real problem here.  His

25    report, what I'm hearing from Mr. Keyhani, doesn't delineate,
```

1    doesn't give any analysis; it's just, Well, he talked a lot

2    about it and, therefore, everyone should understand it's

3    either/or, but we don't know how.

4         And when I hear him talking about looking under the hood

5    and 127 pages, he talks about things -- the three things he

6    talks about, setting aside the one I spent the most time on

7    which is the partitioning, the levels and the Snapdragon, all

8    that occurs after the phone is sold when the application is

9    being used, all those interactions.  The same with the

10   software.  The software is for obtaining things, but it

11   doesn't store anything until they're obtained.  The obtaining

12   all occurs after, Your Honor.

13        That's all I have.

14             THE COURT:  All right.  Thank you.

15             MR. KEYHANI:  Your Honor, I have just one minute, if

16   you would indulge me.

17             THE COURT:  I don't think I need anymore argument on

18   this motion.

19             MR. KEYHANI:  Okay.

20             THE COURT:  With regard to Defendant's motion for

21   summary judgment of non-infringement, this is Document 143,

22   I'm going to deny the motion.  I'm persuaded that there are

23   material questions of fact that are raised that would prohibit

24   summary judgment under Rule 56, both as to the literal

25   infringement and the DOE theories.

1          Okay.  The *Daubert* motions, the parties have asked the

2     Court to take those up on the papers and I will do that.

3          That brings us next to the motion for severance and stay,

4     which is Document 138.  And let me hear from the moving party

5     on that.

6                MR. WILLIAMS:  Thank you, Your Honor.  I'll try to

7     be brief.

8          We submit that severing and staying the case against the

9     Defendants and trying the infringement claim against HTC first

10     would promote judicial efficiency and simplify the case for

11     trial, while removing or minimizing the number of people in

12     the courtroom for the trial.  Our support for this is, in

13     part, the *St. Lawrence* case where the Court looked at two

14     relevant factors--whether the remaining claims are peripheral

15     to the severed claims and whether the adjudication of the

16     severed claims would potentially dispose of the remaining

17     claims.

18          In examining the first factor, the Court looked at the

19     situation where a single manufacturer is the only entity in

20     the United States who makes and sell the only accused products

21     to the retailers, in which case a patent infringement came is

22     peripheral to the claims -- that the patent infringement claim

23     against the retailer is peripheral to the claims against the

24     manufacturers.  So we would submit the first element is

25     satisfied here.

1            For the second factor, it's not required that all

2     remaining claims be resolved by the severance, the

3     manufacturers' case.  This is -- in the manufacturers' case,

4     you only have the potential to resolve the major issues

5     concerning the claims against the customers, not every single

6     issue.  Here all of Mr. Salazar's claims against the

7     Defendants require a finding that the HTC smartphones infringe

8     at least one claim of the asserted patent; also require -- all

9     the claims require a finding that the asserted claim is valid

10    and enforcible, and we would submit that all of Mr. Salazar's

11    claims against the Defendants require a showing that

12    Mr. Salazar complied with the marking requirement.  We would

13    submit that, therefore, trying the case against HTC first

14    raises the likelihood or possibility of disposing of all of

15    the case, or certainly major issues in the case, in an

16    efficient way.

17         That's all I have, Your Honor.

18              THE COURT:  What's the Plaintiff's response?

19              MR. KEYHANI:  Your Honor, Mr. Salazar is the

20    Plaintiff in this case, and Mr. Salazar brought a claim

21    against the Carriers in this case.  He did not bring a claim

22    against HTC Corp.  That issue was resolved in the prior case.

23    It is the Plaintiff who should have the -- decide who they

24    bring a claim against.

25         And the manufacturer, the cases that Defendants, you

1    know, rely on for the support of the notion that it makes

2    sense from an efficiency perspective to sever the customers or

3    Carriers or other parties, those are all cases in which the

4    manufacturer is also part of the lawsuit.  And if that was the

5    case, we probably would agree with Defendants; but in this

6    case, the manufacturer -- the lawsuit against the manufacturer

7    has already been disposed of in the prior case.  There is no

8    way that Mr. Salazar can get any relief by litigating the case

9    against the manufacturer again.  Salazar's claim for damages

10   is from the Carriers.

11        Salazar invested hundreds of thousands of dollars in

12   discovery and in expert reports and deposing 30(b)(6)

13   witnesses of the Carriers and in developing a model based on

14   the Carriers.  The only issue that remains with respect to --

15   that's unique in this case or of a particular uniqueness is

16   the damages issue.  So if the Court was to sever the case,

17   what's going to happen to the damages issue?  We have to have

18   a separate trial.  The Court would have to have two trials.

19   If Salazar was to win on infringement, then we have another

20   trial on damages.  And this doesn't make any sense.  We

21   already got to this point of the case.  They are the actual

22   Defendants in this case.  There is no manufacturer defendant

23   in this case because of the circumstances and the procedural

24   history and where we are at in the prior case.

25        So all those cases that talk about efficiency is when you

1    have the manufacturer and the Carriers or Defendants all in

2    the same case together, and then -- that's often not an

3    unreasonable argument, but that's not the case here.

4        This is a tactical also move we believe on the part of

5    the Defendants to try to get -- to separate damages and

6    bifurcate damages from the issues of liability in this case.

7    They never raised this issue at the beginning of the case.

8    Six months later into the case they raised this issue.  It's a

9    clear tactical issue, advantage, at the complete disadvantage

10   to Salazar -- Mr. Salazar.

11       And so to give the Defendants a tactical advantage for

12   raising this issue later in the case where -- and then based

13   on an argument of efficiency that's not relevant here, because

14   this is an -- as we've discussed earlier today, this is an

15   independent claim relating to transactions in the United

16   States carried out by the Defendant Carriers.  These not

17   transactions carried out by HTC Corp. that are at issue in

18   this case.  There is no liability for HTC Corp's actions.  It

19   was already the subject of a prior case.

20       And at this stage of the case with all the investment of

21   time, cost, it would be unfair and prejudicial for Salazar not

22   to have an opportunity to get to the other side of this.

23   Mr. Salazar is 84 years old.  I don't think''s got another

24   trial in him.  I hope he lives forever, but this is just -- I

25   think we need to address this issue at this time and that's

1    the right thing to do and that's the case that Mr. Salazar

2    brought.

3         Thank you.

4              THE COURT:  Let me ask you this, counsel.

5              MR. KEYHANI:  Yes, sir.

6              THE COURT:  The Intervenors, HTC Corp. and HTC

7    America, after this suit was filed and underway came to this

8    Court and sought to intervene in this action, and once they

9    were granted the right to intervene based on assertions that

10   they owed a duty of indemnification to the Carrier Defendants,

11   they then affirmatively moved for declaratory relief on their

12   own parts both as to non-infringement and invalidity.

13             MR. KEYHANI:  Yes.

14             THE COURT:  I have some concern about that.  I mean,

15   I granted the intervention based on the representations that

16   they owed a duty of indemnity to the Carriers and needed to be

17   in the position of a party before the Court to exercise that

18   responsibility and to have the ability to direct the case and

19   to provide the indemnification that their contractual

20   obligations call for.  I did not grant intervention with the

21   anticipation that they would affirmatively seek declaratory

22   relief on the merits of issues as to them themselves, which

23   they've done.

24        I have some inclination as I sit here today that the

25   better practice would be to sever the Intervenors and stay the

1    Intervenors' case until we get a verdict in the Carrier case,

2    which would prohibit the muddying of the waters, for lack of a

3    better phrase, that I'm afraid may occur through the

4    affirmative declaratory judgment actions of the Intervenors,

5    and whatever -- depending on what the result of the trial with

6    the Carriers is, may render some or all of the severed case

7    regarding the Intervenors as moot.

8        That's not the relief that the Defendants asked for, but

9    it seems to me that's a logical way to manage the case.  And

10   the Court is cognizant of the fact that management of its own

11   dockets is one of the areas where trial courts are afforded a

12   large amount of discretion by the Circuit.

13       What's your view on that?  And then I'll get Defendants

14   Defendant's view on that.

15            MR. KEYHANI:  Your Honor, I do -- we do agree with

16   you, and we've looked at this procedurally.  It's a strange

17   disposition to be bringing a claim that doesn't exist.

18            THE COURT:  As to HTC Corp., I don't think there's

19   any question.

20            MR. KEYHANI:  Yes.

21            THE COURT:  HTC America is a different --

22            MR. KEYHANI:  And, of course, as Your Honor noted,

23   the relationship with HTC Corp. and HTC America, certainly

24   with respect to HTC Corp. we can just move here to dismiss HTC

25   Corp. as a matter of law, I mean their claim, because it's not

1    relevant; it was already disposed of in a prior case.  But our

2    position is that I think doing what Your Honor proposed would

3    also -- to the extent there's going to be witnesses or what at

4    trial, it's going to reduce confusion and all the issues will

5    be addressed in the Carriers' case because, as Your Honor

6    noted, if there is a decision of infringement or

7    non-infringement, the issue of the indemnification liability

8    will be addressed.  At the same time, the damages issue that

9    I've been talking about will be addressed.  All the issues are

10   addressed by severing the Defendants' case.

11       I think Your Honor is correct procedurally.  I think --

12   and we've looked into it.  I think staying it and rendering

13   it -- and staying it pending the case of the Carriers makes a

14   lot of sense from an efficiency perspective, from -- also not

15   to muddy up the case for the jurors.  And there's no prejudice

16   there.  And we also consented -- to be clear, we consented to

17   the intervention for judicial efficiency of getting documents

18   and efficiency of sharing documents, not because we -- we

19   didn't know that they were going to be bringing in a claim,

20   quote unquote, either.

21            THE COURT:  All right.

22            MR. KEYHANI:  So that's our position.

23            THE COURT:  Mr. Williams, do you want to offer an

24   opinion on this?

25            MR. WILLIAMS:  I don't have an opinion, Your Honor,

1    other than to say we prefer the relief we requested, and I

2    understand the Court's discretion.

3              THE COURT:  Okay.  That's fair enough.  Thank you.

4        Well, as to a severance coupled with a stay of the

5    Carrier case as requested on the face of the motion by the

6    Defendants, I'm going to deny that.  I'm going to carry the

7    suggestion that the Court raised sua sponte with the parties

8    of whether a severance of the Intervenors and a staying of

9    that severed case regarding the Intervenors and their

10   affirmative declaratory relief claims would be appropriate to

11   allow a trial to go forward with only the Carrier Defendants

12   as we have discussed.  I'll carry that and give that

13   additional thought and let you know by way of subsequent

14   order.

15       All right.  I show that we have one remaining substantive

16   dispute that is either ripe for argument or it's not going to

17   be referred to the Court on the papers only, and that's a

18   discovery dispute referenced or outlined in Document 133,

19   which is Defendant's motion to compel.  I believe it's

20   interrogatory answers and requests for admissions.

21       Let me hear from the moving Defendants on that, please.

22   And I guess the first question, counsel, is at this late date

23   we still have a discovery dispute that hasn't been resolved

24   that's still relevant?

25             MR. WITTENZELNER:  It is narrowed, Your Honor.  As

1   you noted, there were both -- we moved on both interrogatory

2   answers and RFAs.  Today we are not dealing with the

3   interrogatories.  Those have been resolved.

4         THE COURT:  Okay.

5         MR. WITTENZELNER:  Plaintiff made an attempt to

6   resolve the RFA issue by serving supplemental RFAs, but there

7   are still outstanding issues with respect to a subset of those

8   RFAs.

9         THE COURT:  So what you're telling me is from two

10  groups we're down to one group and then we're down to one

11  subset within that one group.  Is that right?

12        MR. WITTENZELNER:  Correct, Your Honor.  So the

13  requests for admission that remain at issue are No. 22 through

14  34.

15        THE COURT:  Let me ask this question, and I'll

16  direct it to both sides of the case:  Are you satisfied that

17  the Court needs to take its time to hear your competing

18  positions and give you a ruling, or is this something that

19  further efforts to meet and confer between the parties might

20  allow you-all to resolve without the Court having to spend

21  time on it?  Are you at the end of the rope as far as trying

22  to work this out, or do you believe that some additional time,

23  perhaps over the lunch hour today, might give you an

24  opportunity to resolve it and save the Court some time?

25        MR. WITTENZELNER:  I think that's the right

1    decision, Your Honor, if we can revisit it if those

2    discussions aren't fruitful.

3              MR. KEYHANI:  Yes, Your Honor.

4              THE COURT:  All right.  I'm going to carry Document

5    133, and I'm going to direct the parties to meet and confer

6    over the lunch hour and we'll see where we are when we

7    reconvene after that.

8         With that, I think the Court's dealt with all the

9    substantive disputes that haven't been agreed to be submitted

10   on the papers to the parties, and I will give you rulings on

11   those submitted issues on the papers as soon as possible.

12        I've got 10 minutes until 12:00 by my clock.  As I

13   mentioned, I have the privilege of serving on the Judicial

14   Conference of the United States Committee on Space and

15   Facilities, and we have a Zoom meeting over the noon hour

16   that's probably going to extend past 1:00, perhaps by 30

17   minutes, so I'm going to give you an extended lunch hour from

18   now, approximately noon, until about 1:30.  And as soon as I

19   can disengage from that Zoom meeting, I will be back on the

20   bench.  I'm hoping it will be about 1:30.  And I'll see where

21   you are on this issue, and then we'll take up the disputed

22   motions in limine.

23        With that, the Court stands in recess.

24                    (Lunch recess.)

25              THE COURT:  Be seated, please.

1          All right, counsel.  Let's return to the discovery

2     dispute, which we talked about just before the lunch recess.

3     This is what remains of Docket 133.  I was told that there was

4     a subset of the requests for admissions that was still at

5     issue and the parties were going to meet and confer over lunch

6     about that.

7          What is the status of this situation?

8          MR. WITTENZELNER:  Your Honor, I believe we resolved

9     it.  Plaintiff's counsel is going to respond to those requests

10    for admission.

11         MS. STEPHENSON:  That's correct, Your Honor.

12         THE COURT:  Okay.  Then I'll consider it moot and I

13    will deny it as moot based upon those representations.

14         Counsel, I got an indirect message during the lunch

15    recess that there might be an interest on the parties' part

16    about meeting and conferring further with what remains

17    outstanding concerning pretrial issues.

18         I have tomorrow afternoon blocked off beginning at 1:30.

19    I do not have the luxury of pushing this back closer to jury

20    selection than tomorrow.  I'm happy to give you one of two

21    options.  We can go through the disputed motions in limine

22    today, I'll recess, you can meet and confer overnight on the

23    exhibit disputes and hopefully resolve them all.  If you

24    can't, I can take up what remains of outstanding exhibit

25    disputes at 1:30 tomorrow.  Or given the fairly limited number

```
 1    of limine disputes, if you think it would be more productive,

 2    I'll recess now and bring you back at 1:30 tomorrow, and you

 3    can meet and confer on both exhibit disputes and limine issues

 4    in hopes of narrowing both categories, if not completely

 5    resolving them.

 6         I don't have the latitude to give you more than from now

 7    until tomorrow afternoon.  I don't have space on my calendar

 8    between now and jury selection to replicate the time I have

 9    blocked off for tomorrow.

10         So I'm happy to hear from either side.  We'll go through

11    the MILs now and then see about exhibits tomorrow, or I'll let

12    you work on both of those overnight and we'll take them up

13    tomorrow afternoon at 1:30.

14         What's your pleasure, counsel?

15              MR. LANDIS:  Your Honor, I think the parties

16    conferred on this, and our position is that it would be better

17    for us to meet and confer on everything today.  We really

18    think we will resolve a lot of these issues with some meeting

19    and conferring.

20              THE COURT:  Don't dangle that carrot out there.

21              MR. LANDIS:  I know.  I know.  Mr. Culbertson and I

22    were already very close to resolutions but didn't have quite

23    enough time.

24              THE COURT:  All right.  Does Plaintiff join in that

25    representation?
```

1          MR. KEYHANI:  Yes, Your Honor, we do.

2          THE COURT:  Okay.  Well -- and I gather you-all are

3    prepared to spend the remainder of today working on that?

4    You're welcome -- I don't know what your facilities

5    availability are.  I don't have anything else scheduled this

6    afternoon.  You can stay in the courtroom and I'll turn it

7    over to you-all.  If you'd rather go offsite and do what you

8    do, that's fine, too.  But I'm going to, based on the parties'

9    request and which we've just clarified, I'm going to recess

10   the pretrial conference in Salazar versus AT&T Mobility, et

11   al., until 1:30 tomorrow.  If -- and I don't want to be overly

12   optimistic, but if you resolve the limine issues and all the

13   exhibit issues, if you'll notify the Court, you don't have to

14   come back at 1:30 tomorrow.

15        Is there anything else between now and you-all getting

16   back to the hard work of meeting and conferring that I need to

17   take up with you?

18        MR. GILLAM:  Not from the Defendants, Your Honor.

19        MR. CULBERTSON:  Not from the Plaintiff either.

20        THE COURT:  Okay.  Well, it's clear to the Court

21   we've got good lawyers on both sides of this case, and being

22   aware of that, I am more than happy to give you an opportunity

23   to get these things worked out completely and, if not,

24   substantially narrowed.

25        All right.  Given that, we will recess until 1:30

1      tomorrow afternoon.

2                (The proceedings were concluded at 1:45 p.m.)

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2        CORRECT TRANSCRIPT FROM THE RECORD OF

3        PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4        I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5        FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6        COURT AND THE JUDICIAL CONFERENCE OF THE

7        UNITED STATES.

8

9        S/Shawn McRoberts        05/16/2021

10      _____DATE_____
        SHAWN McROBERTS, RMR, CRR
11      FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25